

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-30-1994

# United States of America v. Kim

Precedential or Non-Precedential:

Docket 93-1726

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"United States of America v. Kim" (1994). *1994 Decisions.* Paper 66.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/66

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————————————

No. 93-1726

———————————————


UNITED STATES OF AMERICA

v.

YONG HYON KIM,

Appellant


———————————————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Crim. Action No. 93-00087-01)

———————————————


Argued: February 15, 1994

Before: BECKER, HUTCHINSON and COWEN,
Circuit Judges

(Filed  June 30, 1994)


———————————————


John Rogers Carroll, Esq. (argued)
Carroll & Carroll
400 Market Street, Suite 850
Philadelphia, PA 19106

        Counsel for Appellant

Michael J. Totko
  United States Attorney
Barbara L. Miller (argued)
  Assistant United States Attorneys
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106

        Counsel for Appellee

**OPINION OF THE COURT**

COWEN, <u>Circuit</u> <u>Judge</u>.

Yong Hyon Kim ("Kim") appeals from the judgment of conviction and sentence entered on July 19, 1993 by the United States District Court for the Eastern District of Pennsylvania. Kim was convicted in the district court of possessing with the intent to distribute six kilograms of methamphetamine in violation of 21 U.S.C. § 841(a)(1) and sentenced to a term of imprisonment of 300 months. Kim contends that the district court erred in denying his motion to suppress evidence of drugs allegedly seized in violation of the Fourth Amendment and in applying a two-level sentencing enhancement for obstruction of justice. As this is an appeal from a final judgment of the district court, we have jurisdiction under 28 U.S.C. § 1291. We reject Kim's arguments and will affirm the conviction and the sentence imposed.

I.

Kim is a thirty-nine-year-old adult male. He was born in Korea but subsequently immigrated with his family to the United States at the age of seventeen. Prior to the occurrence of the events that gave rise to the indictment against him, Kim had continuously lived in the United States for twelve consecutive years and attended South Philadelphia High School.

2

This background indicates, and Kim does not deny, that Kim understood and spoke English well during his encounter with the police, which is at issue in this appeal.

On August 26, 1992, DEA Special Agent Kevin Small ("Small") observed Kim and his friend, Song Youn ("Youn"), on an Amtrak train when it stopped at the Albuquerque station. This Amtrak train normally travels between Los Angeles and Chicago. It regularly leaves Los Angeles eastbound during the evening, crosses the deserts of Southern California and Arizona during the night, and enters New Mexico the following morning. Shortly after noon, the train makes a scheduled stop in Albuquerque. Law enforcement officials believed that this route was employed by drug dealers to traffick drugs from Los Angeles back to the eastern area. Small, together with other law enforcement officials, was involved in several prior investigations and searches on the train in an effort to interdict drugs.

During a train stop on August 26, 1992, Small, accompanied by Sam Candelaria ("Candelaria"), a local police officer on the DEA task force, went to roomette number 12, occupied by Kim and Youn. A roomette in a sleeper car costs more than a coach seat and affords somewhat more privacy than other accommodations. Roomette 12, however, was located in a busy area of the train. It was only ten feet from the entrance to the sleeper car, next to the luggage storage room, and two feet from a stairwell leading to the upper floor of the sleeper car.

Small knocked on the door to Roomette 12 and Kim opened the door. Youn was inside with Kim. Shortly before this time,

3

Small activated a concealed recorder to record any conversation that he may have with the occupants of the roomette. Candelaria was working with Small, but was out of sight, having stationed himself around the corner of the train corridor. Small said in a polite and conversational tone, "How are you guys doing? I'm with the police department." Small bent slightly to show his badge to Kim and Youn who were seated, then knelt in the hallway. At that time Small did not block the doorway or enter the roomette. He remained outside in the hallway in a kneeling position.

Small began to ask several questions, including their point of origin, destination, and place of residence. Kim readily responded to the questions. Small asked if he could see their tickets. Youn produced two tickets in the name of Yong Kim and Terry Park. While Youn was showing the tickets, Small asked how the ride had been. Youn replied, "Real good." Small handed the tickets back to Youn and thanked him. Small then inquired if they had any photo identification. Youn said his name was "Park" and that he had no picture identification with him, while Kim said he had.

At that time, several persons walked past in the train hallway, talking loudly. Candelaria, out of sight to Kim and Youn, waved a piece of paper at Small to inform him that the train reservation was made in the name of "Wonz." Small asked to see the tickets again and handed them back to Youn.

Small asked about Kim and Youn's luggage. He told them that he worked for DEA and that DEA had "problems with people on

4

board trains smuggling drugs out of L.A. back East."  He then asked, "You guys don't have drugs in your luggage today, do you?"  Kim answered no.  Small asked, "Would you voluntarily consent for me to search?"  Kim readily replied, "Sure."  At that time, several persons passed by Roomette 12.  Small then pointed to a leather bag and asked if it was Kim's.  Kim answered yes.  Youn also offered to move his bags down for Small, but Small stated that he wanted to examine the bags one at a time.

Upon opening the leather bag, Small found six cans of "Naturade All-Natural Vegetable Protein."  They appeared to be factory-sealed cans with factory lids which were intact.  Small asked what it was and what it was for.  Kim replied that it was vegetable protein and that he did not know what it was because he "got it for a present."  Small asked where Kim got it.  Kim replied, "We bought it in L.A."  Small asked Kim if he was sure what the cans contained.  Kim did not say anything.  Youn answered, "It's closed."  Small opened one of the cans and asked Kim who gave them to him.  Kim replied, "The guy in L.A."  Small asked, "What guy?"  There was no answer.  Small then handed the can to Candelaria who determined that it contained drugs.  The agents then placed Kim and Youn under arrest.

Subsequently it was discovered that Kim made at least two trips to Los Angeles in an apparent attempt to engage in drug trafficking, one in July of 1992, the other in August of 1992 during which he was arrested.  Kim was then charged with (1) possessing with the intent to distribute six kilograms of methamphetamine in violation of 21 U.S.C. § 841(a)(1), and (2)

5

conspiracy to distribute methamphetamine in violation of 21 U.S.C. § 846. Before the trial began, Kim made a motion to suppress the drugs uncovered by Small, contending that Kim was unconstitutionally seized during the encounter with Small and, in any event, his consent to search his luggage did not extend to the sealed cans in the luggage. The district court denied the motion. The jury subsequently convicted Kim of the possession count, but acquitted him of the conspiracy count. On appeal, Kim primarily challenges the denial of his motion to suppress the methamphetamine.

## II.

We first address whether an unconstitutional seizure occurred when Small encountered Kim. In reviewing the decision of the district court, we apply the clear error standard with respect to the factual findings. See United States v. Coggins, 986 F.2d 651, 654 (3d Cir. 1993). With respect to the ultimate legal question of whether a seizure occurred, we exercise plenary review. Id.

The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. amend. IV. The Supreme Court has interpreted this amendment as requiring probable cause for making an arrest, e.g., Hayes v. Florida, 470 U.S. 811, 814-16, 105 S. Ct. 1643, 1646 (1985), and reasonable suspicion of criminal activity for making an investigative stop, Terry v. Ohio, 392 U.S. 1, 30, 88 S. Ct. 1868, 1884-85 (1968).

6

With respect to police conduct that falls short of an investigative stop, the Supreme Court has made clear that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." Florida v. Bostick, ___ U.S. ___, ___, 111 S. Ct. 2382, 2386 (1991). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may [a court] conclude that a `seizure' has occurred." Id. (citations and internal quotation marks omitted). When an encounter is consensual, no reasonable suspicion is required.

In a line of cases starting with United States v. Mendenhall, 446 U.S. 544, 554–58, 100 S. Ct. 1870, 1877–79 (1980), to Florida v. Royer, 460 U.S. 491, 493–508, 103 S. Ct. 1319, 1321–29 (1983) (plurality opinion) and Michigan v. Chesternut, 486 U.S. 567, 573, 108 S. Ct. 1975, 1979 (1988), the Supreme Court indicated that "a seizure occurs when a reasonable person would believe that he or she is not `free to leave.'" Bostick, ___ U.S. at ___, 111 S. Ct. at 2386. Relying on this language, Bostick, who was questioned by the police in the "cramped confines" of a bus on which he was to travel, argued that he was not free to leave and, thus, was seized. Id. at ___, 111 S. Ct. at 2384–86.

The Supreme Court clarified in Bostick that the "free to leave" language makes sense when police attempt to question a person who is walking down the street or through an airport lobby as in Royer, but not when, for reasons unrelated to the police conduct at issue, the defendant is not free to simply walk away.

7

Id. at ___, 111 S. Ct. at 2387.  Individuals may have to stay in their workplace by reason of their employment contract, INS v. Delgado, 466 U.S. 210, 218, 104 S. Ct. 1758, 1763 (1984), or remain in a seat in the bus that was about to depart, Bostick, ___ U.S. at ___, 111 S. Ct. at 2386.  Under these circumstances, the test is whether a reasonable person would feel free "to disregard the police and go about his business," id. at ___, 111 S. Ct. at 2386, or ultimately "whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter," id. at ___, 111 S. Ct. at 2387, "taking into account all of the circumstances surrounding the encounter," id.

The location of the encounter at the roomette on a train brings this case under the rubric of Bostick.  It is therefore our task to decide whether, under the totality of the circumstances in the case sub judice, a reasonable person would have felt free to decline Small's requests or otherwise terminate the encounter with him.  In our assessment of the encounter, we must accord all factors an appropriate weight rather than treat any one factor as dispositive.

The encounter at issue in this case began with a polite knock at the door of Kim's roomette.  Small was in plain clothes, his gun was not visible, nor did he ever display his gun.  When Kim responded by opening the door, Small commenced the conversation by asking politely how Kim and Youn were doing and identifying himself as employed by a police department.  Small then requested, "Can I talk to you for a second?"  Without

hesitation or equivocation, Kim answered, "Yeah." The conversation went forward in a normal conversational tone. Without more, the posture of the encounter indicated that it was purely consensual. Kim, however, argues that several factors made this encounter nonconsensual and a seizure in violation of the Fourth Amendment. We will address these arguments in turn.[0]

Kim argues that a seizure occurred because the encounter was in a confined area in a non-public setting, and because Small blocked the exit. Of course, "[w]here the encounter takes place is one factor, but it is not the only one."

---

[0]Kim relies primarily on two cases of the Court of Appeals for the Tenth Circuit. Those two cases involved encounters somewhat similar to that at issue in this case where a seizure was found in each under a multi-factor balancing test. See generally United States v. Bloom, 975 F.2d 1447 (10th Cir. 1992); United States v. Ward, 961 F.2d 1526 (10th Cir. 1992). The authority of these cases is exaggerated by Kim. In a subsequent case with somewhat similar facts, the Court of Appeals for the Tenth Circuit itself, sitting in banc, appears to have modified Bloom and Ward. United States v. Little, No. 92-2155, 1994 WL 88834, at * 4-5 (10th Cir. Mar. 22, 1994) (in banc). Little held that Bloom and Ward were overruled to the extent they established a per se rule that any encounter at a train roomette, without a specific advisement by the officer that the defendant need not answer questions, constituted an unlawful seizure because the location of an encounter is not determinative. Id. at * 1, * 4.
Secondly, we note that any persuasive authority of those cases is further reduced in this case, by reason of the inherently fact-oriented, case by case analysis we must conduct. In cases decided before Bloom and Ward, the Court of Appeals for the D.C. Circuit found no seizure under strikingly similar circumstances. See, e.g., United States v. Tavolacci, 895 F.2d 1423, 1424-26 (D.C. Cir. 1990) (encounter at the door of a roomette in a sleeper); cf. United States v. Savage, 889 F.2d 1113, 1116-17 (D.C. Cir. 1989) (encounter at the door to a roomette became an investigative stop only after forceful, repeated questioning of Savage). This being the case, we need not specifically reject any of the analysis in Bloom and Ward, which addressed different encounters with somewhat different factual scenarios.

9

Bostick, ___ U.S. at ___, 111 S. Ct. at 2387.  Our inquiry is how the location of the encounter contributed to a reasonable person's belief that he was not free to terminate the encounter.

We believe the location of the encounter in this case would contribute little to such a belief.  As the Supreme Court pointed out, "an individual may decline an officer's request without fearing prosecution," id., because "a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure," id. The location in itself does not deprive an individual of his ability to terminate an encounter; he can reject an invitation to talk in a private, as well as a public place.[0]  See also Little, 1994 WL 88834, at * 3-5.

Nor do we believe a confined area in a train is inherently coercive.  Courts have long ago rejected the argument that "the narrowness and confinement of a train compartment are inherently isolationist, hence coercive."  United States v. Brady, 842 F.2d 1313, 1315 n.5 (D.C. Cir. 1988).  See also United States v. Hoffman, 964 F.2d 21, 23 n.3 (D.C. Cir. 1992) (cramped conditions alone do not invalidate the otherwise lawful police

---

[0]We note that the district court found the location of the encounter was a public place.  Kim argues that it was a private place.  We believe the location of the roomette and the bustling hallway, as described in the next two paragraphs in this opinion, indicate that the district court's finding was not clearly erroneous.  We do not need to definitively decide the public or private nature of the location in this case, however, because the characterization of the location of the encounter as public or private is not dispositive as to whether the encounter is consensual.

10

conduct); <u>Tavolacci</u>, 895 F.2d at 1424-26; <u>Savage</u>, 889 F.2d at 1116-17.

Moreover, the district court found that Small did not in fact block the doorway or exit. Kim argues that the district court's finding is clearly erroneous. We have reviewed the record and conclude that it is not.[0] Small testified that he knew he was "supposed to [leave] enough room for someone to pass by [him]," and that he "was not blocking the door." App. at 91. This testimony was uncontradicted. Moreover, the door was open during the entire encounter. The roomette was in a well-trafficked area, only ten feet from the entrance to the sleeper car, next to the luggage storage room, and two feet from a stairwell leading to the upper floor of the sleeper car. Voices of the passersby could occasionally be heard on the tape. Directly across from Kim's roomette was the train conductor's room. The door to that room was open and the conductor was in his room during the relevant time period. The conductor passed by in front of Kim's roomette several times to speak to passengers in the hallway. Kim could see the conductor and passengers. Close to Kim's roomette on the same hallway was a

[0]We disagree with the dissent's contrary conclusion. While Kim testified that Small leaned "on the side of the door" or in the doorway, that testimony, even if taken as true, did not contradict the fact that Kim did not <u>block</u> the doorway. Leaning on the side of a door is not the same as blocking the doorway. Kim did not say that Small crossed the threshold or leaned inside the Roomette. <u>See</u> Dissent Typescript at 8 (Small did not lean "into the compartment."). Even if Kim had said that Small blocked the doorway, we would still have to uphold the finding of the district court who is in a better position to evaluate the testimony of the witnesses and may have made its decision based on the credibility of the witnesses.

11

large family room occupied by four or five people. Passengers inside that room watched and heard the encounter. Finally, the door to Kim's roomette was a sliding door, which Kim could have easily closed if he wanted to terminate the conversation.

Kim argues that these facts notwithstanding, a reasonable person would not feel free to decline to answer Small's questions or to shut the door, because "[i]t doesn't take much intelligence for a reasonable person to believe that shutting the door in the face of such an intruder would be to invite more serious intrusion." Reply Brief for Appellant at 2. We disagree. As the Supreme Court stated, "an individual may decline an officer's request without fearing prosecution." Bostick, ___ U.S. at ___, 111 S. Ct. at 2387. We hold that under the facts of this case, a reasonable person would have felt free to decline to speak or to terminate his conversation with Agent Small. See id.

Kim next argues that he had a higher expectation of privacy because he was traveling in a private sleeping compartment and that a reasonable person would see his roomette as a safe haven, different from the public coach areas of a train. While we recognize the differences between a roomette in a sleeper car and a seat in the coach area, we do not believe that Kim's expectation of privacy has any overriding importance in our analysis as to whether a seizure occurred. Expectation of privacy is significant in the analysis of whether consent or probable cause is required for making a search, see, e.g., Ex parte Jackson, 96 U.S. 727 (1878); Katz v. United States, 389

12

U.S. 347, 88 S. Ct. 507 (1967).  It sheds no light on <u>what is consent or a consensual encounter</u>.  As far as consent is concerned, one may consent to an encounter in the privacy of his own home or in a public square.  <u>See</u> <u>Katz</u>, 389 U.S. at 351, 88 S. Ct. at 511 ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."); <u>Lewis v. United States</u>, 385 U.S. 206, 87 S. Ct. 424 (1966) (defendant waived his right to privacy in his home by inviting an undercover agent inside).  The high expectation of privacy, alone, will not destroy the otherwise consensual nature of the encounter.[0]  <u>See</u> <u>Little</u>, 1994 WL 88834, at * 5 ("expectation of privacy has only a limited relevance").

Kim contends that Small asked focused and potentially incriminating questions.  When asked such questions, Kim argues, "an innocent passenger may well feel obligated to demonstrate innocence by cooperation," Brief for Appellant at 28, and "a guilty passenger must feel terrorized and trapped," <u>id.</u>  Kim points to a question that Small asked: "You guys don't have drugs in your luggage today, do you?"  First, we do not believe this question was accusational.  The tone of the question in no way implied that Small accused or believed that Kim had drugs in his possession; it was merely an inquiry.

Secondly, what a guilty passenger would feel and how he would react are irrelevant to our analysis because "the

---

[0]Kim's argument based on higher expectation of privacy appears to be a restatement of his argument based on the location of the encounter, which we have rejected above.  Such a factor, as we stated, is at most but one factor in our balancing analysis.

`reasonable person' test presupposes an <u>innocent</u> person."
<u>Bostick</u>, ___ U.S. at ___, 111 S. Ct. at 2388.  We do not believe
an innocent person would feel compelled to cooperate with police
by some potentially incriminating questions.  In any event,
potentially incriminating questions are permissible.  As the
Supreme Court stated in <u>Bostick</u>:

> The dissent reserves its strongest criticism for
> the proposition that police officers can approach
> individuals as to whom they have no reasonable
> suspicion and ask them potentially incriminating
> questions.  But this proposition is by no means novel;
> it has been endorsed by the Court any number of times.
> <u>Terry</u>, <u>Royer</u>, <u>Rodriguez</u>, and <u>Delgado</u> are just a few
> examples.  As we have explained, today's decision
> follows logically from those decisions and breaks no
> new ground.  Unless the dissent advocates overruling a
> long, unbroken line of decisions dating back more than
> 20 years, its criticism is not well taken.

<u>Id.</u>  See also <u>Little</u>, 1994 WL 88834, at 6 ("The asking of
`incriminating questions' is irrelevant to the totality of the
circumstances surrounding the encounter.").[0]

We therefore hold that potentially incriminating
questions do not by themselves make an encounter coercive.  In so

---

[0] The dissent cites to several cases decided in or before 1990
prior to <u>Bostick</u> (1991) for a position contrary to the <u>Bostick</u>
language as quoted here.  Those cases also conflicted with
<u>Little</u>.  We follow the Supreme Court language, and not the cases
cited by the dissent.  <u>See</u> Dissent Typescript at 9-10.

14

ruling, we note that Kim cites to only one question, Brief for Appellant at 28, and thus the case does not present the scenario of repeated and persistent questioning of an individual, which was found to constitute an investigative stop in United States v. Savage, 889 F.2d 1113, 1117-18 (D.C. Cir. 1989).

Kim next argues that Small asked his questions in a "blunt" and "direct" manner which contributed to the coerciveness of the encounter. We disagree. The district court found that Small's tone was polite and conversational. After reading the transcripts of the questions and listening to the tapes ourselves, we agree with the district court. Such a tone would not cause a reasonable person to believe that he was not free to terminate the encounter.

Conceding that Small spoke smoothly and politely, Kim focuses on "the type of questions that the agent asked, rather than their delivery." Brief for Appellant at 28-29. Kim argues that the questions themselves conveyed the message that Kim and Youn were being accused of carrying drugs. We do not read the questions themselves as indicating any accusation of drug possession. To the extent that Kim's argument rests on the types of questions asked, it is a recharacterization of his argument that the encounter was a seizure because he was asked "potentially incriminating questions," which we have already rejected.

Kim also bases his seizure theory on the fact that Small failed to advise Kim of his right to decline the Agent's requests or terminate the encounter. While such advice may well

15

be evidence of the consensual nature of an encounter following the advice, the absence of such advice does not necessarily eliminate the consensual nature of the encounter.  As the Supreme Court stated, "[w]hile most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response."  Delgado, 466 U.S. at 216, 104 S. Ct. at 1762-63.  A reasonable person is presumed to know of his right not to answer questions without fear of prosecution.  See Bostick, ___ U.S. at ___, 111 S. Ct. at 2387.  Courts have clearly rejected the "attempt to Mirandize [F]ourth [A]mendment consents."  United States v. Kikumura, 918 F.2d 1084, 1093 (3d Cir. 1990) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047 (1973)).  As a result, we believe that the failure to advise Kim of his right to terminate the conversation itself did not make the encounter unconstitutional.

To the extent that the number of police officers and the individuals present during the encounter has any relevance to our analysis, as the court believed in Bloom, 975 F.2d at 1454 (two agents versus one private citizen), and in Ward, 961 F.2d at 1531-32 (defendant was alone), we hold that this factor militates in favor of the government in this case.  During the entire encounter, Small appeared to Kim to be alone, while Kim was accompanied by his friend Youn who was present with him.  Another police officer was out of sight to both Kim and Youn.

For the foregoing reasons, we reject Kim's contentions.  After reading the transcript of the conversation

between Kim and Small, and listening to the tone of the tape recording of that conversation, we believe the encounter was not coercive. The totality of the circumstances demonstrates that Kim voluntarily answered Small's questions, and was cooperative during the entire encounter.[0] Furthermore, we cannot say the district court's finding that Agent Small did not block the doorway during questioning is clearly erroneous. We therefore conclude that the encounter was consensual and did not produce tainted fruit inadmissible at trial.

## III.

Kim contends that his encounter with the police was a seizure and therefore his consent to search was tainted by that seizure. Brief for Appellant at 35-37. As we conclude that Kim was not seized during the encounter, Kim's contention of taint naturally fails. Still, we feel it appropriate to examine separately whether the district court erred in finding that Kim voluntarily consented to the search of Kim's luggage. The district court's determination of consent to search the luggage is a finding of fact, see Schneckloth, 412 U.S. at 227, 93 S. Ct.

---

[0]The dissent faults us for analyzing several factors in isolation. To the contrary, we base our conclusion that the encounter was voluntary on all of the circumstances surrounding the encounter including Small's manner and tone and Kim's voluntary responses to Small. The dissent itself describes a typical Small encounter as follows: "[Small] makes no threats. His tone is polite and conversational. He does not show a gun. He behaves much like a door-to-door salesman who can keep his foot in the door and the prospect talking until he has made a sale (or in Small's business, an arrest)." Dissent Typescript at 2 n.1.

17

at 2047-48, and is subject only to clearly erroneous review. See, e.g., Kikumura, 918 F.2d at 1093. We find no clear error in this case.

It is well settled that the government may undertake a search without a warrant or probable cause if an individual consents to the search, and any evidence discovered during such a search may be seized and admitted at trial. Schneckloth, 412 U.S. at 219, 93 S. Ct. at 2043-44 (1973). Our task is to decide whether Kim consented to the search of his luggage.

As the Supreme Court instructed, "[w]hen a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given." Schneckloth, 412 U.S. at 222, 93 S. Ct. at 2045 (internal quotation marks and citations omitted). "[W]hether a consent to a search was in fact `voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." Id. at 227, 93 S. Ct. at 2047-48. Thus whether consent was given is to be resolved by examining all relevant factors, without giving dispositive effect to any single criterion. Certain factors that courts consider in determining whether confessions were voluntary, such as the age of the accused, his education, his intelligence, whether he was advised of his constitutional rights, and whether the questioning was repeated and prolonged, id. at 226, 93 S. Ct. at 2047, are relevant to our examination. See United States v. Velasquez, 885

18

F.2d 1076, 1081–83 (3d Cir. 1989), cert. denied, 494 U.S. 1017, 110 S. Ct. 1321 (1990).

While not giving an exhaustive list of relevant factors, the Supreme Court in Schneckloth did teach that "[w]hile knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent." Schneckloth, 412 U.S. at 227, 93 S. Ct. at 2048. Nor is the government required to advise the defendant of his right to refuse consent before eliciting his consent. Id. at 231–34, 93 S. Ct. at 2049–51.

Applying these principles to the case sub judice, we hold that the district court did not clearly err in finding that Kim consented to the search of his luggage. The tape recording of the conversation between Small and Kim and the transcript of that recording indicate Kim spoke English well and answered Small's questions without hesitation. Kim had been a permanent resident alien in the United States for over twelve years and attended high school in Philadelphia.

Most important, when Small asked if Kim would voluntarily consent to a search of his luggage, Kim readily responded, "Sure." App. at 34. During the entire short conversation, Kim was cooperative. He readily confirmed to Small the identity of his luggage. Kim's demeanor was no doubt a strong indication of voluntariness. Even his travel companion Song Youn testified that Kim was not at all reluctant to permit

19

Small to search his luggage, and that Kim readily consented to the search. App. at 304.

Moreover, the whole encounter was short, lasting only several minutes. There was no threat of force against Kim. Small was the only officer visible to Kim and Youn. Nor was the atmosphere coercive. Small was polite and his tone was courteous and conversational. There was no repeated and prolonged questioning. Nor did Small ask Kim direct, probing, or incriminating questions. During the entire period, Small mentioned only that he was looking for illegal drugs. That was not a probing or incriminating question; it was meant to inform Kim of Small's mission and the scope of his search so as not to mislead Kim. In any event, such questioning alone is not dispositive under a totality of circumstances analysis. It certainly does not outweigh the overwhelming evidence of voluntariness as analyzed above. Nor do we believe it significant that Kim was not advised of his right to refuse consent, particularly in the face of strong evidence of voluntariness. See Schneckloth, 412 U.S. at 227-33, 93 S. Ct. at 2048-50; Kikumura, 918 F.2d at 1093.

For the foregoing reasons, we conclude that the district court was correct in finding that Kim voluntarily consented to the search of his luggage.

IV.

Kim also contends that his consent to the search of his luggage did not extend to the search of the sealed containers

20

within one of his bags, and therefore the drugs found in those containers are inadmissible.  We reject this argument.

It is clear that "[w]hen an official search is properly authorized--whether by consent or by the issuance of a valid warrant--the scope of the search is limited by the terms of its authorization."  Walter v. United States, 447 U.S. 649, 656, 100 S. Ct. 2395, 2401 (1980).  "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of `objective' reasonableness--what would the typical reasonable person have understood by the exchange between the officer and the suspect?"  Florida v. Jimeno, ___ U.S. ___, ___, 111 S. Ct. 1801, 1803-04 (1991).  Applied to the case sub judice, the inquiry is whether a reasonable person would have understood the exchange between Small and Kim as indicating that Kim's authorization to search his luggage for drugs included permission to search the sealed cans placed inside his luggage.

We therefore examine the exchange between Small and Kim to determine what a reasonable person would understand the scope of the consent to be.  Before starting the search, Small informed Kim and his friend Sung Youn that he worked for DEA and was looking for illegal drugs, and asked if they had any drugs in their luggage.  After that Small asked him, "Would you voluntarily consent for me to search?" App. at 34.  Kim responded, "Sure."  Id.  Kim then identified one of his bags for Small.  Upon opening the bag, Small discovered some cans.  Small asked what was in the cans and what it was for.  Kim said it was vegetable protein.  Small asked whether Kim was sure that the

21

cans contained vegetable protein.  Kim said nothing.  Youn said, "It's closed," and repeated it.  App. at 35.  Small proceeded to open the can and Agent Candelaria subsequently determined that the cans contained methamphetamine.  Kim and Youn were then arrested.

We conclude that a reasonable person would understand Kim's authorization for a search of his luggage to include permission to search any items found inside his luggage.  Common sense supports this understanding.  Small indicated that he was looking for illegal drugs, and his search target was the luggage.  Kim gave his permission for Small to search his luggage for drugs.  Cans such as those found in Kim's luggage may be thought by a reasonable person to contain drugs.  Thus the permission to search the luggage covered the cans found in that luggage.

The ruling of the Supreme Court in Jimeno, ___ U.S. at ___, 111 S. Ct. at 1803-04, a case analogous to the one before us, lends support to our conclusion.  In Jimeno, the Supreme Court held that "it was objectively reasonable for the police to conclude that the general consent to search respondent's car included consent to search containers within that car which might bear drugs.  A reasonable person may be expected to know that narcotics are generally carried in some form of a container." Id. at 1804.

Kim attempts to distinguish this case from Jimeno by pointing out that the search was conducted around a sleeping compartment on a train rather than in a car as in Jimeno, and that the drugs in this case were contained in sealed cans rather

22

than in a bag simply folded as in Jimeno. We conclude that these distinctions do not defeat the principle underlying the Jimeno ruling that when one gives general permission to search for drugs in a confined area, that permission extends to any items within that area that a reasonable person would believe to contain drugs.

We believe that the place where the encounter took place is not significant because it did not operate to coerce Kim, as we have analyzed above, to give his general permission to search his luggage. Moreover, the distinction between the sealed cans in this case and the folded bags in Jimeno does not mandate a different result because they both are what a reasonable person would believe could function as drug containers. To repeat the language of the Supreme Court, "a reasonable person may be expected to know that narcotics are generally carried in some form of a container." Id.

We note that the Supreme Court indicated that "[i]t is very likely unreasonable to think that a suspect, by consenting to the search of his trunk, has agreed to the breaking open of a locked briefcase within the trunk." Id. However, cans such as those found in the case sub judice are not similar to locked briefcases. We therefore reject the argument based on the above language of the Supreme Court addressing a different matter. We draw support from United States v. Springs, 936 F.2d 1330, 1334–35 (D.C. Cir. 1991), where the court upheld the search of a sealed baby powder container. The court there rejected an argument almost identical to Kim's:

23

the evidence supports a view that the opening of the baby powder container did not depend upon possession of a key, knowledge of a combination, or anything other than merely removing its lid.  Neither did the fact of its opening render it useless, anymore than the opening of the folds destroyed the usefulness of the paper bag in Jimeno.

Id. at 1334–35.  The same scenario occurred in this case and we follow the reasoning of Springs.

Finally, Kim contends that after Small obtained general permission to search Kim's luggage, he should have also asked for specific permission to search each bag and, more importantly, for permission to open the cans when Small discovered them in Kim's luggage.[0]  Such an argument for more explicit and specific authorization has been rejected by the Supreme Court in Jimeno. The Court stated that if a suspect's consent "would reasonably be understood to extend to a particular container, the Fourth

---

[0]Upon opening the bag, Small discovered some cans.  The following colloquy ensued:

| SMALL: | What is this stuff? |
| KIM: | Vegetable protein. |
| SMALL: | What do you use it for? |
| KIM: | I don't know.  I got it for -- |
| YOUN: | For health. |
| KIM: | -- a present. |
| SMALL: | A prisent?  A present!  Who gave it to you, you know? |
| KIM: | We bought it in L.A.  Coffee, and these. |
| SMALL: | Okay.  You're sure that's what's inside one of these? |
| YOUN: | It's closed. |
| SMALL: | Huh? |
| YOUN: | It's closed. |
| SMALL: | It's closed? |

App. at 34–35.

24

Amendment provides no grounds for requiring a more explicit authorization." Jimeno, ___ U.S. at ___, 111 S. Ct. at 1804.

We have already concluded above that Kim's consent to search his luggage for drugs extended to the cans in the luggage. Of course Kim could have limited his consent to certain items, but he had the burden to express that limitation, id., which he did not do. Kim readily gave his general consent to the search, without hesitation or limitation. Even Youn subsequently testified that Kim was not at all reluctant to permit Small to search his bags. App. at 304.

The fact that Youn said, "It's closed," App. at 35, does not help Kim. It is worth emphasizing that Youn, not Kim, said those words. Kim, who gave general authorization to search and readily identified his own luggage for Small, said nothing. Therefore, it was reasonable for Small to conclude that Kim, who bore the burden to limit his own permission, did not attempt to impose any limitations on his general permission. After all, Youn, who was not Kim's guardian, would not be considered by a reasonable person to be able to legally limit Kim's consent.

More important, Youn's words would not be understood by a reasonable person as a limitation on Kim's consent because Youn spoke those words not in an attempt to limit the search, but rather in response to Small's question, "You're sure that's what's inside one of these?" Id. Youn's answer was another way of saying, "I don't know because it is closed." Accordingly, Kim did not limit his general consent to search to any specific items. For the foregoing reasons, we hold that it was reasonable

25

for Small to conclude that Kim's consent to search extended to the cans found in his luggage.

V.

Finally, Kim argues that the district court erred in upwardly adjusting his sentence by applying a two-level enhancement for obstruction of justice, pursuant to U.S.S.G. §3C1.1. That provision mandates a two-level enhancement "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense." U.S.S.G. § 3C1.1. This provision applies to false statements made during a defendant's cooperation with law enforcement authorities. See, e.g., United States v. Banks, 964 F.2d 687, 693 (7th Cir.), cert. denied, ___ U.S. ___, 113 S. Ct. 470 (1992).

The facts that led the district court to make the two level upward adjustment essentially related to Kim's conduct during his cooperation with the government. Shortly after he was arrested, Kim decided to cooperate with DEA. Deliberately concealing his first trip to Los Angeles in July 1992, Kim told the agents that the August 1992 trip during which he was arrested was his only trip to Los Angeles. He further informed the DEA agents that he had been asked to bring the cans back to Philadelphia as a gift, and that someone was supposed to meet him at the train station or to pick them up at his house. He offered to assist DEA to deliver the methamphetamine to the intended

26

recipient in Philadelphia. The DEA agents attempted to stage a controlled delivery by placing Kim back in the original train. No one showed up to meet Kim. The evidence revealed that by that time Kim had already called his employer's home to inform them of his arrest and his cooperation with DEA. Based on these facts, Kim claims that there is no evidence of willful obstruction. Furthermore, Kim argues, even if there was obstruction, it did not relate to the "instant offense," possession of methamphetamine with the intent to distribute, of which he was convicted, but related solely to the conspiracy charge of which he was acquitted.

We exercise plenary review over the district court's interpretation and application of the Sentencing Guidelines. United States v. Belletiere, 971 F.2d 961, 964 (3d Cir. 1992). We review the factual findings of the district court for clear error, id., and "where the district court's finding involves a mixed question of law and fact, our standard and scope of review takes on greater scrutiny, approaching de novo review as the issue moves from one of strictly fact to one of strictly law." Id. (internal quotation marks omitted).

We first address the threshold question of whether the facts that the district court relied upon to apply the upward adjustment related to the "instant offense" within the meaning of the Guidelines. The language of the guideline indicates that "instant offense" refers to the particular offense of which the defendant was convicted of. "Any interpretation other than that § 3C1.1 refers to efforts to obstruct the prosecution of the

27

conviction offense would only render this modifier meaningless." United States v. Perdomo, 927 F.2d 111, 118 (2d Cir. 1991), quoted in Belletiere, 971 F.2d at 967. Accord, e.g., United States v. Barry, 938 F.2d 1327, 1333 (D.C. Cir. 1991). Furthermore, the Sentencing Commission's own interpretation supports this reading of the guideline. As we pointed out, "[t]he commentary to section 3C1.1 makes it clear that the section's focus is on willful acts or statements intended to obstruct or impede the government's investigation of the offense at issue." Belletiere, 971 F.2d at 968. Accordingly, in order for the district court to apply a two-level upward adjustment, the facts showing Kim's obstruction must relate to the offense of possessing methamphetamine with the intent to distribute, of which he was convicted, or its investigation, prosecution, or sentencing.

Kim contends that the facts that arguably constituted obstruction of justice at most pertained only to the conspiracy count of which he was acquitted, rather than the possession count. His argument is that the possession offense was complete in Albuquerque because "[t]he government took the drugs and Kim's possession ended." Brief for Appellant at 48. His allegedly false cooperation with the government was useful only to catch certain third parties, so the argument goes, and was included solely in the charged conspiracy of which he was acquitted.

We disagree. While it is clear that Kim's false cooperation related to the conspiracy charge, that fact alone does not necessarily demonstrate that his conduct could not also

28

relate to the possession count.  Viewing the indictment and the facts as a whole, we conclude that Kim's false cooperation related to the possession charge of which Kim was convicted.  The possession offense may well have stopped when the government took the drugs from Kim.  But the "investigation, prosecution, or sentencing" of that offense did not stop at that point.

The possession offense of which Kim was charged and convicted has three elements:  (1) Kim's possession of six kilograms of the methamphetamine; (2) his knowledge that the substance he possessed was a controlled substance; and (3) his intent to distribute the controlled substance.  See 21 U.S.C. §841(a)(1).  The government had the burden of proving every element beyond a reasonable doubt.  In order to carry that burden, the government must conduct a thorough investigation of every fact that related to those three elements.  The government's investigation of other participants in the scheme directly bore upon two elements of the offense: Kim's knowledge that the substance in the cans was a controlled substance and his intent to distribute.

In particular, Kim's material misstatements about other participants and his trip to California in July of 1992 related to his knowledge of methamphetamine in the cans.  In order to prove Kim's knowledge, the government may have needed to prove how the methamphetamine came into Kim's possession and, thus, needed accurate information regarding the events preceding the encounter in front of the train roomette on August 26, 1992.  The evidence shows that Kim deliberately provided false and

inaccurate information with respect to his contact and his trip to Los Angeles in July of 1992.

To prove the intent to distribute element, the government may have needed to identify who was waiting for the methamphetamine. Kim deliberately called the home of his employer Kenneth Lee (also known as Kwang Suk Yi), warning him of his cooperation with the government, thus tipping off the intended recipient of the methamphetamine. Of course, this obstructed the government's investigation of the intent element: no one actually showed up to receive the methamphetamine from Kim. Accordingly, the facts upon which the district court based the two-level enhancement were intimately related to investigation and prosecution of two elements of the possession offense and therefore related to the "instant offense" within the meaning of U.S.S.G. § 3C1.1.

We next address the issue of whether there is evidence of willful obstruction. The language of § 3C1.1 plainly requires that upward adjustment be based only on willful obstruction of justice. Willful obstruction includes "providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense." Id. comment. (n.3(g)).

Willfulness denotes "an act which is intentional rather than accidental." Belletiere, 971 F.2d at 965 (internal quotation marks omitted). In the context of applying § 3C1.1 in a sentencing determination, the evidence must show that the defendant "intentionally obstructed or attempted to obstruct

30

justice." Id. Since the government sought to upwardly adjust Kim's sentence, it bore the burden of proving by a preponderance of the evidence that Kim willfully obstructed or attempted to obstruct justice. Id.

Kim argues that the district court erred in failing to make a specific factual finding of willful obstruction, which failure warrants a remand. We read the record differently. During the sentencing hearing, the district court specifically stated that the court imposed the sentence on Kim for his serious criminal conduct and his "subsequent misleading of the Government's investigation by not telling the truth or appearing to help them [sic] when he, in fact, was not doing this." App. at 612. This language indicates that the district court found that Kim intentionally misled the government in order to thwart the investigation. Read in the context of the sentencing hearing, and coupled with the evidence of Kim's false cooperation and misstatements in the record, the district court's statement more than constituted a finding of willful obstruction of justice.

Kim next argues that there was no evidence to support the finding of the district court. We disagree. The district court made its finding of Kim's misleading the government's investigation only after reviewing the pre-sentencing report and hearing arguments from both parties. See App. at 589-612. The record reflects that the government proved Kim's deliberate false statements to the government agents. The district court certainly did not clearly err.

31

First, Kim deliberately concealed his first trip to Los Angeles in July of 1992 when the methamphetamine shipment was due. Kim admitted to lying about his trip in order to shift the focus of the government investigation away from him. App. at 382. Kim also deliberately misled the government about the identity of the individual who delivered to him the cans containing the methamphetamine. As mentioned above, these falsehoods directly related to and impeded the investigation of one of the elements of the possession count: Kim's knowledge of the controlled substance contained in the cans.

Second, the record also supports the finding of the district court that Kim deliberately misled the government's investigation as to who would be the intended recipient of the cans of methamphetamine which directly related to the intent to distribute element of Kim's possession charge. Kim contends that there was no direct evidence that Kim willfully obstructed the investigation. The district court, however, indicated that it could infer willfulness from the course of Kim's conduct during the sham cooperation. App. at 593. We have reviewed the record and conclude that the district court's inference was not clear error.

The record reveals that Kim made several misrepresentations to the government agents during the course of his alleged cooperation with the government in order to assist the government in catching the intended recipient of the drug. He misled the agents into believing that he would assist them in effecting a controlled delivery in Philadelphia. On the pretext

32

of calling his home to find out whether his wife had given birth to their child, Kim called Lee and informed Lee's wife that he was cooperating with DEA, knowing that this would tip off the intended recipient. In his subsequent testimony, Kim conceded that because of this disclosure, "everybody" knew about the situation. App. at 390.

Kim first told the agents that the recipient would come to the train station or his home. But at the last minute while staying at a hotel with the agents, he changed his story. Then Kim said that the recipient would contact him through a beeper, which was at his home. Kim then called his home and asked his brother-in-law to bring his beeper for him to use. Shortly afterwards, his brother-in-law, accompanied by Kenneth Lee, brought the beeper to the hotel room. Kim told the agents that Lee spoke only Korean (when he in fact spoke English) and proceeded to speak with him in Korean which the agents did not understand. Subsequently no one showed up to pick up the cans of methamphetamine.

From this factual scenario, the district court was entitled, we conclude, to find that Kim intentionally obstructed the government's investigation of the intended recipient of the methamphetamine which related to Kim's intent to distribute the drug. The district court found that Kim probably manipulated the timing of his story of the pager to bring Lee to the hotel in order to assure him that Kim was acting as if he was cooperating, but in fact was not. Clearly if Kim simply wanted the beeper, he could have asked his brother-in-law to bring it to the hotel,

alone, without enlisting the help of Lee. Although there was no direct evidence of the conversation between Lee and Kim, the district court's inference was not clearly erroneous.

We are aware of the commentary to U.S.S.G. § 3C1.1 stating that "testimony or statements should be evaluated in a light most favorable to the defendant." U.S.S.G. § 3C1.1, comment. (n.1). Nonetheless, we conclude that the entire course of conduct of Kim's false cooperation with the government amply supports the finding of the district court. In this context, we must bear in mind that the government's burden is not to prove its position beyond a reasonable doubt, but only by a preponderance of the evidence. Belletiere, 971 F.2d at 965.

Kim finally contends that he called Lee not to tip off the intended recipient, but to pay "the courtesy of a telephone call," Brief for Appellant at 46, to his employer. He asserts this was "within the norm for a defendant who has just been arrested and has made an important decision to assist the government," id. With this argument, Kim attempts to explain away his willfulness to impede the investigation.

We reject this version of what occurred. The district court believed, and we agree, that a truly cooperating defendant would not undermine the cooperation. Although it may be reasonable for a defendant to inform his family and employer that he will not be home as scheduled, it was not necessary for Kim to disclose that he was cooperating with the government. He had several other options. Instead, he chose to call his employer under the pretext of calling his wife to inquire about the birth

34

of their child. Had he been forthright about calling his employer, the agents may have attempted to stop him. More important, Kim disclosed in the phone call that he was cooperating with the government, <u>knowing</u> that the information would be made known to others. Kim must have known that the effect of his call would be to tip off the intended recipient of the drugs of the danger of being caught if he came to meet Kim. These facts rendered Kim's explanation not credible. The district court did not clearly err in inferring that Kim willfully impeded the investigation.

Accordingly, we conclude that Kim willfully obstructed the investigation and prosecution of the instant offense within the meaning of U.S.S.G. § 3C1.1 and that the district court's finding of willful obstruction is supported by the record. The district court did not err in applying a two-level upward adjustment in Kim's sentence for obstruction of justice.

VI.

For the foregoing reasons, we will affirm in all respects the judgment of conviction and sentence entered by the district court.

<u>United States v. Kim</u>

No. 93-1726

BECKER, Circuit Judge, dissenting.

This appeal presents two discrete Fourth Amendment issues. They are both [...] but, with all respect, I believe that the majority has gotten them both wrong. Fir[...] believe that the facts taken as a whole show that a reasonable person in defendant[...] position would not have felt free to terminate the encounter and hence that there w[...] seizure. More specifically, a seizure occurred because Agent Small confronted Kim [...] non-public part of the train, blocked Kim's exit from the roomette, asked Kim focus[...] incriminating questions, and never advised Kim that he had a right to terminate the[...] encounter. As I see it, at the time Small asked Kim whether he had drugs in his lug[...] Small had seized him. And since Small had no reasonable suspicion at the time he [...] Kim, the consent Kim gave to search his luggage was involuntary. Second, I think t[...] even if the majority is right that Small had not seized Kim and that Kim's consent [...] search of his luggage was thus voluntary, Small exceeded the scope of Kim's consent[...] he opened one of the sealed Naturade All-Natural Vegetable Protein canisters he fou[...] Kim's luggage. I would therefore hold that the motion to suppress should have been[...] granted and that the convictions should be overturned.

## I. THE SEIZURE

I agree with the majority that the seizure question in this case falls un[...] rule of Florida v. Bostick, 501 U.S. 429, 111 S. Ct. 2382 (1991), which tells us th[...] person has been seized if, under the totality of the circumstances, a "reasonable p[...] would feel free to decline the officers' requests or otherwise terminate the encoun[...] 111 S. Ct. at 2387.[0] A review of the circumstances surrounding the encounter betwe[...]

---

[0]The encounter between Kim and Small occurred in a sleeper car on an AMTRAK train c[...] the "Southwest Chief," which travels between Los Angeles and Chicago. Agent Small [...] with Officer Candelaria) has become something of a legend among the district judges[...] Mexico and the appellate judges in the Tenth Circuit. His drug interdiction effort[...] the Albuquerque train station have singlehandedly spawned an entire jurisprudence a[...] searches and seizures on trains. No fewer than nine published opinions in that cir[...]

Small and Kim, however, shows that a reasonable person would not have felt free to

terminate the encounter.

To begin with, the encounter occurred in a train roomette, a non-public s

The non-public nature of the setting is a factor that weighs in favor of a conclusi

a seizure occurred because police conduct in non-public areas tends to be more coer

See United States v. Ward, 961 F.2d 1526, 1531 (10th Cir. 1992) (stating that "whet

encounter occurs in the public view is particularly significant" to the question of

whether a seizure occurred).  See also Berkemer v. McCarty, 468 U.S. 420, 438, 104

3138, 3149 (1984) (expressly recognizing the importance of an encounter occurring i

public place).[0]

---

including an en banc opinion, grapple with the Fourth Amendment issues raised by hi
actions.  See United States v. Moore, 1994 WL 131523 (10th Cir. April 18, 1994); Un
States v. Little, 18 F.3d 1499 (10th Cir. 1994) (en banc); United States v. Zapata,
F.2d 751 (10th Cir. 1993); United States v. Hall, 978 F.2d 616 (10th Cir. 1992); Un
States v. Bloom, 975 F.2d 1447 (10th Cir. 1992); United States v. Ward, 961 F.2d 15
(10th Cir. 1992); United States v. Scales, 903 F.2d 765 (10th Cir. 1990); United St
Miller, 811 F. Supp. 1485 (D.N.M. 1993); United States v. Armijo, 781 F. Supp. 1551
(D.N.M. 1991).
    Based on these reported cases, Small's method of operation is distinctive
apparently always essentially the same.  Before the "Southwest Chief" stops in Albu
during its run between Los Angeles and Chicago, he reviews the train manifest looki
passengers travelling in sleeping cars on one-way tickets paid for with cash.  Whe
finds such a passenger, he knocks on the passenger's roomette door, stands in the d
and begins a carefully constructed inquisition that quickly leads to the question "
you voluntarily consent for me to search."  He makes no threats.  His tone is polit
conversational.  He does not show a gun.  He behaves much like a door-to-door sales
can keep his foot in the door and the prospect talking until he has made a sale (or
Small's business, an arrest).  He is an enormously capable and highly successful po
officer.  But his arrests have not always been upheld against Fourth Amendment chal
and, at all events, we must analyze the facts of this case on their own.
[0]     The majority opinion in the recent Tenth Circuit en banc case discussing
United States v. Little, 18 F.3d 1499 (10th Cir. 1994) (en banc), questioned the
assumption that a non-public encounter makes the police conduct more coercive than
occurs in a public setting.  Id. at 1504 & n.5.  It stated, not unpersuasively, tha
people may in fact feel more coerced when they are confronted in a public setting a
submit to police requests because they do not want to make a spectacle of themselve
        Although the Little majority's view on this question has intuitive appeal
does not appear to be in accord with the view of the Supreme Court.  As Judge Logan
pointed out in dissent in Little, the Supreme Court has explicitly stated in the co
of giving Miranda warnings that public settings are inherently less coercive.  Litt

3

The district court's finding that the setting was public was, in my opini[on]

clearly erroneous.  Although someone renting a roomette probably does not have the [same]

expectation of privacy as someone sitting in his or her home, a roomette passenger'[s]

expectation of privacy is certainly much higher than a coach passenger's.  In my vi[ew,]

privacy expectation is quite similar to that of an individual who has rented a hote[l room,]

and it is well settled that a hotel room is a non-public place.  See Stoner v. Cali[fornia,]

376 U.S. 483, 489-90, 84 S. Ct. 889, 893 (1964) (according full Fourth Amendment

protection to hotel guests); Eng Fung Jem v. United States, 281 F.2d 803, 805 (9th [Cir.]

1960) ("The transience of appellant's stay in the [hotel] room searched by the offi[cers]

does not dilute the force of constitutional protection.  The hotel room in question [was]

appellant's dwelling.  That he lived there for but several days is of no consequenc[e.").]

Moreover, Stoner has been extended beyond hotel rooms to cover other temp[orary]

dwelling places.  See, e.g., United States v. Gooch, 6 F.3d 673, 678 (9th Cir. 1993[) (tent]

pitched in public campground was non-public place entitled to same protection as a [hotel]

room).  Courts have also recognized higher expectations of privacy in private livin[g]

quarters on ships.  See United States v. Alfonso, 759 F.2d 728, 738 (9th Cir. 1985) [("The]

private living quarters [of a ship] are at least analogous to a private dwelling. [As a]

result, even in the context of a border search, the search of private living quarte[rs on a]

ship should require something more than naked suspicion.").  These cases suggest th[at a]

---

F.3d at 1511 (Logan, J. dissenting) (quoting Berkemer, 468 U.S. at 438, 104 S. Ct. [at]
3149).  In Berkemer, the Supreme Court said:

> [t]he typical traffic stop is public, at least to some degree.  Passersby[, on]
> foot or in other cars, witness the interaction of officer and motorist. [This]
> exposure to public view both reduces the ability of an unscrupulous polic[eman to]
> use illegitimate means to elicit self-incriminating statements and dimini[shes]
> the motorists fear that, if he does not cooperate, he will be subjected t[o]
> abuse.

468 U.S. at 438, 104 S. Ct. at 3149.  Until the Supreme Court states otherwise, the[n,]
we must operate under the assumption that encounters with the police in non-public
settings are inherently more coercive.

4

place set aside for sleeping in private carries with it a much higher expectation o

privacy and should be considered a non-public place.  Cf. Minnesota v. Olson, 495 U

99, 110 S. Ct. 1684, 1689 (1990) ("We are at our most vulnerable when we are aslee

because we cannot monitor our own safety or the security of our belongings.  It is

this reason that, although we may spend all day in public places, when we cannot sl

our own home we seek out another private place to sleep, whether it be a hotel room

the home of a friend. Society expects at least as much privacy in these places as i

telephone booth -- 'a temporarily private place whose momentary occupants' expectat

freedom from intrusion are recognized as reasonable.'" (quoting Katz v. United Stat

U.S. 347, 361, 88 S. Ct. 507, 517 (1967) (Harlan, J concurring))); United States v.

707 F.2d 362, 366 (9th Cir. 1982) ("Those living on their boats have a greater expe

of privacy at night."), cert. denied, 464 U.S. 992, 104 S. Ct. 483 (1983).  I belie

a train roomette, an enclosed cabin with a bed and a sink, is no less a temporary o

place than a pitched tent in a campground, a private berth on a ship, or a hotel ro

Of course a conductor can enter the roomette at different times during th

But the fact that a conductor may enter to check tickets or in case of an emergency

that an attendant may enter to make the bed and clean up the room the next morning,

not lower the expectation of privacy a passenger has in the roomette with respect t

entries into the roomette for purposes totally unrelated to those duties of the tra

crew.  The right of access to the hotel room by managers and housekeepers, for exam

does not transform the hotel room into a public place.  See Stoner, 376 U.S. at 489

S. Ct. at 893 (noting that although a person engaging a hotel room gives permission

maids, janitors or repairmen to enter the room in the performance of their duties,

permission does not give police license to enter to search for incriminating evider

Chapman v. United States, 365 U.S. 610, 616, 81 S. Ct. 776, 780 (1961) (explaining

although a landlord had actual authority to enter into a house to "view [a tenant's

waste" and gave his permission to search, the police violated a tenant's constituti

5

right when they searched the tenant's house since the search was unrelated to viewi

waste). I see no reason why this principle should not apply with equal force in th

roomette setting.

It is also virtually undisputed that the roomette was a cramped and confi

setting. The roomette, which was seven feet wide and less than four feet deep, was

similar to a moderately sized walk-in closet. The only access to and from the room

was through a door that was only two feet wide. The hallway outside the doorway wa

itself only two and a half feet wide. Such cramped confines increase the coercive n

of the encounter, making it less likely that a reasonable person would feel free to

terminate it. Cf. Bostick, 501 U.S. at 429, 111 S. Ct. at 2389 ("The cramped confi

a bus are one relevant factor that should be considered in evaluating whether a

passenger's consent is voluntary.").

Making the encounter in the cramped and confined space even more coercive

the fact that Small blocked Kim's only means of exit. Kim argues, and I agree, tha

district court's finding that Small did not block the doorway is clearly erroneous.

claimed that he was kneeling five to six inches from the door during much of the en

(the district court accepted this testimony, finding that he had been five inches f

door). For Kim to have terminated the encounter by leaving the roomette would have

required him to vault over Small, through a two foot doorway into approximately 30

of landing space (really somewhat less because Small's body would have occupied a

considerable part of the hallway). I think it is inconceivable that a reasonable p

would have felt free to ignore Small by passing over him into the narrow hallway wh

Small knelt during the encounter. Cf. United States v. Savage, 889 F.2d 1113, 1116

Cir. 1989) (stating that blocking the door would have been relevant to the question

seizure because it would have prevented defendant from leaving the compartment).

Of course, it might be argued that Kim could have terminated the encounte

simply by shutting the door. If so, it might not matter whether Small blocked Kim'

6

from the train. But I do not think a reasonable person would think they could termi[nate] the encounter with the police by slamming a door in the officer's face. See Savage[,] F.2d at 1116 (saying nothing about whether the defendant could shut the door). In[deed, I] am not sure that it matters much to the inquiry whether Kim had alternative methods [of] terminating the encounter other than exiting the train for the fact that Small may [have] left Kim a variety of ways of terminating the encounter does not mean that a reason[able] person would have felt free to use them. For example, a seizure would certainly ha[ve] occurred had Small entered into the roomette and shut the door behind him regardles[s of] whether Kim could have terminated the encounter by some other means like telling Sm[all to] go away, or climbing out a window.

In any event, I do not believe that Kim could have shut the door during t[he] encounter. The findings the district court made about the configuration of the tra[in,] about the traffic passing up and down the hallway, and Small's claim that he left r[oom for] the passengers walking up and down the hallway, make it virtually certain that Smal[l] leaned inside the room for important periods of time during the episode and thus pr[evented] the door from being shut.

The majority tries to avoid this problem by stating that Small's testimo[ny that] he "was not blocking the door" was uncontradicted. This assertion is simply incorr[ect.] Both Youn and Kim testified that Small was leaning against the side of the doorway, [not] leaning against the door itself. Youn testified that Small was "definitely in the [] doorway" and Kim testified "He was kind of leaning through the doorway -- not into [the] compartment. He was leaning on the side of the door."

In my opinion, both Youn's and Kim's testimony that Small was leaning aga[inst] the doorway throughout the encounter is inherently credible because: 1) leaning ag[ainst] the doorway would be the natural way to conduct a conversation with anyone sitting [in the] roomette; 2) it would allow Small the ability to conceal the fact that he was passi[ng] things to Candelaria throughout the encounter; 3) and it would allow other passenge[rs]

7

pass freely down the hallway.  By contrast, I believe Small's testimony that he was

to six inches from the door is incredible because 1) if Small really had been five

inches outside the roomette, there would not have been enough room for people to pa

without at least acknowledging Small, and nowhere does the tape record an "excuse m

similar statement by even a single passenger passing Small in the corridor;[0] and 2)

the large amount of noise in the train at the time, it seems doubtful that Kim coul

even heard Small's "polite and conversational" voice had Small stayed five to six i

outside the roomette.

Not only did the encounter occur in a non-public, confined setting with S

blocking the only means of exit, but Small also asked Kim and Youn focussed and

potentially incriminating questions.  Small first asked them about their citizenshi

status.  Apparently, the sight of two Asian men travelling to Philadelphia from Los

Angeles made Small think that they might be illegal aliens, and no doubt his questi

communicated these thoughts to Kim.  He then asked them "[y]ou guys don't have any

in your luggage today, do you?"  By asking this after looking over their tickets tw

informing them that he was a DEA agent on the train looking for drug traffickers, S

communicated the message that Kim was a specific target of the agent's investigati

least two courts have found that a seizure occurred when an officer asked similar

questions of a suspect.  See United States v. Nunley, 873 F.2d 182, 185 (8th Cir. 1

(seizure occurred as soon as agent told defendant that he was part of a narcotics u

was trying to stop the flow of drugs through the St. Louis airport); United States

---

[0]If he had been kneeling, as Small testified he had been, his legs would have stuck
approximately 18 inches into the hallway.  That would have left other people in the
corridor with less than 12 inches to pass without touching Small.  And if he had be
to six inches from the doorway, he would have left other passengers with only six t
inches to pass.  Again it is likely that they would have had to step over at least
part of Small's body when they passed Kim's roomette and there is nothing on the ta
indicating in any way that they did.  Unless people on the train from Los Angeles h
worse manners than average people, or are more nimble and svelte, one would have ex
something on the tape where the passing passengers acknowledged Small's presence.
is nothing of the kind on the tape.

8

Gonzales, 842 F.2d 748, 752 (5th Cir. 1988) (seizure in an airport occurred when a

agent told defendant that he was "working narcotics" and asked to look in the bag),

overruled on other grounds, United States v. Hurtado, 905 F.2d 74 (5th Cir. 1990).

---

Both Nunley and Gonzales were airport cases.  In each case, the encounter
occurred in the airport terminal, a non-cramped and public place where it would hav
quite easy for the defendant to walk away.  They are therefore much weaker cases th
one, where similar questions were asked to a defendant who was trapped in the confi
space of the roomette.  As I see it, if it is true that a seizure occurred where si
questions were asked to a defendant in a public setting, then it must be the case t
seizure would have occurred where such questions were asked in a cramped and confin
setting.

The majority comments in a footnote that "the dissent has cited to severa
decided in or before 1990 prior to Bostick (1991) for a proposition contrary to the
Bostick language [that police may ask potentially incriminating questions without
converting an encounter into a seizure].  Those cases also conflicted with Little."
Op. at 15 n.6.  I see no conflict between Bostick and either Nunley or Gonzales.  B
cases employ the same totality of the circumstances approach endorsed in Bostick.
873 F.2d at 185; Gonzales, 842 F.2d at 748.
Apparently the majority believes that the language from the Bostick case makes the
question whether focused and incriminating questions were asked irrelevant to the t
of the circumstances inquiry.  I see nothing in the language of Bostick that leads
a conclusion.  Bostick merely says that police may approach a person and ask potent
incriminating questions without necessarily converting the encounter into a seizure
does not follow from such a proposition that asking incriminating questions is irre
to the question of whether a reasonable person would have felt free to terminate th
encounter.

Indeed, a number of post-Bostick cases recognize that asking incriminatin
questions -- like asking a person whether he or she is carrying drugs -- is relevan
the question whether a person was seized.  See, e.g., United States v. McCarthur, 6
1270, 1276 (7th Cir. 1993) (stating that one relevant consideration is whether the
indicate through their questioning that they were a specific target, like asking wh
they are carrying drugs); United States v. Adebayo, 985 F.2d 1333, 1338 (7th Cir. 1
(discussing as relevant to the seizure analysis whether the police asked the defend
whether he was carrying drugs, and explaining United States v. Borys, 766 F.2d 304
Cir. 1985), which held that it is relevant to the seizure question whether the offi
informs an individual that he is conducting a drug investigation and then asks the
individual if he has drugs in his possession), cert. denied, 113 S. Ct. 2947 (1993)
United States v. Wilson, 953 F.2d 116, 122-23 (4th Cir. 1991) (persistent questioni
even when polite, by itself, created a seizure).  Wilson is particularly noteworthy
because in that case there were no coercive elements of the encounter other than th
questioning the police.  The panel in that case could not have reached its result i
asking incriminating questions was irrelevant to the inquiry.

Thus the majority's claim that the dissent ignores Bostick is misplaced.
Properly construed, Bostick allows courts to consider the incriminating nature of t
questioning as one part of the totality of the circumstances.  And this conclusion
fully consistent with post-Bostick case law.

9

Furthermore, not only did the questioning seek to incriminate Kim, but th[e] questions were also blunt and direct. Although the majority dismisses the importan[ce] this fact by stating that Small's tone was polite and conversational, that response the point. Bluntness and directness describe the type of questions asked, not the [way] in which they were asked. See, e.g., Nunley, 873 F.2d at 184-85 (not even mentioni[ng] whether the officer's tone was confrontational or rude to the defendant). Although tone of the officer's voice is relevant to the extent that a forceful tone of voice [may] make a reasonable person think that they must comply with the officer's requests, s[ee] United States v. Savage, 889 F.2d 1113, 1115 (D.C. Cir. 1989), the lack of such a f[orceful] tone does not entirely deprive blunt and direct questions of their coercive force. [The] questions Small asked Kim about citizenship and drug trafficking were as sharp and focussed as they could be under the circumstances, given that Small had absolutely [no] articulable suspicion that any crime had been committed, let alone that Kim had co[mmitted] a crime.

Finally, it is undisputed that Small failed to advise Kim of his right t[o] decline the agent's requests or terminate the encounter. The majority dismisses th[is] as unimportant stating that "[w]hile such advice may well be evidence of the conse[nsual] nature of an encounter following the advice, the absence of such advice does not necessarily eliminate the consensual nature of the encounter." This statement is t[ypical] of the majority's approach to this case. The majority examines each fact of the en[counter] in isolation and considers whether each fact, by itself, would have made a reasonab[le] person believe he was not free to terminate the encounter. See Maj. Op. at 11 ("No[ne] believe a confined area in a train is inherently coercive"); Maj. Op. at 13 ("we do[n't] believe that Kim's expectation of privacy [in the roomette] has any overriding impo[rtance] in our analysis as to whether a seizure occurred"); Maj. Op. at 15 ("potentially

10

incriminating questions do not by themselves make an encounter coercive") (emphases

supplied).

The clear implication of the majority's analysis in this case is that, un

the defendant can come forward with a piece of evidence that would make the encount

per se seizure, the defendant will not be able to show that there was a seizure. I

opinion, such an approach transforms the "totality of the circumstances" analysis c

Bostick into a mirror image of the per se approach rejected in Bostick. Bostick te

that a court must consider all of the evidence in combination to determine whether

circumstances were such that a reasonable person would not feel free to terminate t

encounter. The question whether one factor does or does not necessarily create a s

is simply no longer relevant after Bostick.

Perhaps as a result of this failure to implement the Bostick standard, th

majority fails to recognize that although Small's failure to advise Kim that he had

right to terminate the encounter may not by itself create a seizure, it nevertheles

tip the balance under a true totality of the circumstances analysis. This is parti

true in this case because the circumstances are otherwise so similar to Bostick. C

critical, and perhaps decisive, importance in Bostick was the fact that the two pol

officers questioning Bostick on the bus had "specifically advised Bostick that he h

right to refuse consent." 111 S. Ct. at 2385, 2388. If we believe that Bostick

represents a case in which the actions of the police were almost coercive enough to

to a seizure, the absence of such a warning in a situation similar to that in Bosti

should be enough to tip the balance.

In sum, given that the setting was non-public and that Small was asking F

Youn incriminating questions while blocking the door to the roomette, Small's failu

advise Kim that he could terminate the encounter made the encounter a seizure. I k

11

that no reasonable person would have felt free to terminate the encounter under suc[h]

circumstances.[0]

## II. THE SCOPE OF CONSENT

Even if Small did not seize Kim prior to his search of the luggage, Small['s]

search of the sealed vegetable protein canisters he found within the luggage violat[ed the]

Fourth Amendment because it exceeded the scope of the consent.[0] As the majority me[ntions,]

Small asked to search Kim's bag and Kim said he could. Small then saw six metal-li[ned,]

factory-sealed canisters labelled "Naturade All-Natural Vegetable Protein." Without

Kim's permission, and after Kim told Small that they were meant to be a present, Sm[all]

opened the factory seal and handed the canister to Candelaria asking him to poke ar[ound]

inside the can to see what he could find. The question is whether Small reasonably

---

[0]Of course, Small's seizure of Kim would not violate the Fourth Amendment if he had
reasonable suspicion to detain him. See United States v. Sokolow, 490 U.S. 1, 7, 10[9 S.]
Ct. 1581 (1989); Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868 (1968). Small did not,
however, have reasonable suspicion. At the time Small asked Kim whether he had dru[gs in]
his luggage (the time that I believe the seizure occurred because by this time the
encounter was not only in a cramped, non-public space, but had involved focused and
incriminating questioning), Small knew the following facts: 1) Kim and Youn had pu[rchased]
one-way tickets; 2) the tickets were purchased for cash; 3) they had upgraded to a [sleeper]
car en route from Los Angeles; 4) they were travelling to Philadelphia; 5) Kim was [a]
naturalized citizen born in Korea; 6) Youn was in the U.S. Marines; 7) Youn's ticke[t was]
in the name of "Terry Park" (there is no evidence that Small knew that this was an a[lias]
at the time of the encounter, however); and (8) the train manifest had the name "Wo[ng"]
assigned to the sleeper. These facts are all consistent with innocent travel, and t[hey]
fall woefully short of the particularized suspicion sufficient to justify a Terry s[top.]
Compare United States v. Coggins, 986 F.2d 651 (3d Cir. 1993) (reasonable suspicion [found]
when the defendant matched the standard profile for drug couriers, was using a fals[e name,]
rented a car for only a few hours before returning it, appeared nervous and highly
agitated, and was traveling with two recognized drug traffickers).

[0] The majority addresses the question whether Kim voluntarily consented to Small's [search]
of his luggage and concludes that Kim did so consent. It then concludes that "the
district court was correct in finding that Kim voluntarily consented to the search [of his]
luggage." I am not entirely sure why the majority has chosen to undertake this par[ticular]
consent analysis. Kim apparently concedes that, absent a seizure, his consent to s[earch]
the luggage (though not the sealed container) was voluntarily given. Of course, if [there]
was an improper seizure, Kim's consent to the search of the luggage pursuant to tha[t]
improper seizure was involuntary, absent a break in the causal chain. Apparently, t[he]
majority concedes that there was no break in causation between Small's initial enco[unter]
with Kim and his search of the bag. Thus, if the seizure was improper, the fruits [of the]
search should have been suppressed.

believed that Kim's consent to search his luggage gave Small permission to open the

canisters.  The majority holds that it did.  I disagree.

We know from Florida v. Jimeno, 500 U.S. 248, 111 S. Ct. 1801 (1991), tha[...]

scope of a search is defined objectively and that under such an approach a suspect'[...]

general consent to search a car includes consent to search a folded paper bag lying [...]

floor of the car.  111 S. Ct. at 1804.  But we also know that consent to search a l[...]

container does not include consent to search all smaller containers inside.  Id.  A[...]

Jimeno itself stated, "[i]t is very likely unreasonable to think that a suspect, by [...]

consenting to the search of his trunk, has agreed to the breaking open of a locked [...]

briefcase within the trunk."  Id. (citing State v. Wells, 539 So.2d 464 (Fla. 1989)[...]

officer in Jimeno, Wells, and this case requested consent to search for narcotics; [...]

the defendant in each case consented under similar contexts, making the scope of th[...]

consent similar.  Hence the question ultimately posed by this case is whether the f[...]

sealed canister is more like a locked briefcase or a folded paper bag.[0]

The majority's entire discussion of this question is as follows: "cans su[...]

found in the case sub judice are not similar to locked briefcases."  That is simply[...]

conclusion. There is no discussion of the relevant differences between the two obje[...]

purposes of the reasonable scope of a consent to search.  In my opinion, the differ[...]

between the folded paper bag in Jimeno and the locked briefcase in Wells has to do [...]

the owner's greater expectation of privacy in the contents of the briefcase than in[...]

---

[0]The majority frames the issue as a matter of whether or not the canisters reasonab[...]
could have contained drugs.  It frames the issue in this way because it abstracts f[...]
Jimeno the proposition that when an officer requests permission to search for drugs[...]
such permission is given, "the permission extends to any items within that area tha[...]
reasonable person would believe to contain drugs."  Such a reading of Jimeno cannot[...]
right.  Jimeno clearly states that it would have been "unreasonable" to think that [...]
suspect consents to the search of a locked briefcase inside a car trunk when he con[...]
to search of a trunk.  Yet it certainly is reasonable to think that a locked suitca[...]
those circumstances contains drugs.

paper bag, and in the owner's greater property interest in not having the lock on h
briefcase broken than in not having his paper bag opened.

I believe, however, that a heightened expectation of privacy can be evide
something other than a lock -- gift-wrapping around a package, for example. Of cou
sealed package like a can of food or a box with plastic shrink-wrap around it does
really evidence a strong privacy interest. Labels on products will often display
prominently the contents of a package. This is where the second distinction become
important, however. Consent to search property cannot reasonably be construed to n
consent to damage the property. There is a strong property interest in sealed pack
and opening them often damages the value of that interest.

In my opinion, the Naturade All-Natural Vegetable Protein canister Small
from Kim's luggage was no different than a can of tuna fish, a carton of milk, or a
briefcase, all of which would be seriously damaged once opened. Once the seal was
the canister simply would not be able to keep its contents free from spoilage to th
extent it could before. And if it was meant to be a gift, as Kim told Small before
opened the lid, it would not be much good once opened. I believe it to be unreasona
a police officer to think that consent to search luggage includes consent to open u
sealed package, particularly one that bears no visible evidence of tampering and wh
officer has been told is going to be used as a gift.

Although the majority cites United States v. Springs, 936 F.2d 1330, 1334
(D.C. Cir. 1991), to support its conclusion that an officer can break into sealed
containers during a consensual search, I do not believe Springs stands for this
proposition. In Springs, although the baby powder container had a lid (which the m
somewhat disingenuously calls a "seal"), there was no evidence in the opinion that
container was sealed in the sense that the baby powder had a factory vacuum seal co
its opening. In fact, the baby powder container had pry marks on it suggesting tha
someone had already opened the container. Id. at 1332. Thus Springs really only h

14

that a police officer can remove the lid of an obviously already opened container w
is looking for drugs.

        Springs reached its conclusion in part by distinguishing the baby powder
container from the locked briefcase discussed in Jimeno on two grounds: 1) the baby
container did not have a key, and 2) opening the baby powder container would not re
useless.  For the reasons discussed above, neither distinction forecloses Fourth Am
protection in this case.  First, as was mentioned above, although the locked nature
briefcase is strong evidence of the owner's intent to keep its contents private, it
not follow that a key or lock is necessary for a box or container to be outside the
of a consensual search of this kind.  Second, Springs' discussion of "useless[ness]
suggests agreement with the principle that consent does not reasonably extend to se
that will physically damage the property being searched.  As discussed above, when
to the facts of this case, this principle suggests that Small exceeded the scope of
consent.

        It is becoming a shibboleth in this area of the law for courts to say tha
are usually not scattered loosely throughout larger containers.  See, e.g., Jimeno,
Ct. at 1804; Springs, 936 F.2d at 1334-35.  I fully concede that it is appropriate
police officer to look at smaller containers found in luggage that may possibly con
drugs.  But once the police officer has looked at the item and it is either wrapped
sealed, it is unreasonable for the police officer to think that the consent to sear
luggage gives him license to damage the item by opening it without asking permissio

        I respectfully dissent.

---

[0]Moreover, before Small opened the canister, Youn said, "[i]ts closed."  I believe
reasonable officer would take that to mean that he should not open the container.
majority attempts to wave this problem away in part by stating that Youn's statemen
not mean that Small should not open the canister but rather that he simply did not
what was in the canister. According to the majority, "Youn's answer was another way
saying, 'I don't know because it is closed.'"  But Youn did not say "I don't know b
it is closed."  He said, "It's closed."

15