UNITED STATES of America, Plaintiff,

v.

Reinaldo HERNANDEZ, Defendant.

Cr. A. No. 94–60 MMS.

United States District Court,
D. Delaware.

Dec. 20, 1994.

Gregory M. Sleet, U.S. Atty. and Thomas V. McDonough, Asst. U.S. Atty., Dept. of Justice, Wilmington, DE, for plaintiff.

David J. Goldstein, of Goldstein, Weinstein & Fuld, Bronx, NY, for defendant.

## *OPINION*

MURRAY M. SCHWARTZ, Senior District Judge.

### I. Introduction

The Grand Jury for the District of Delaware has charged the defendant, Reinaldo Hernandez, with violating 21 U.S.C. § 841(a)(1) and § 841(b)(1)(A), the knowing possession with intent to distribute five or more kilograms of a mixture containing cocaine. Docket Item ("D.I.") 8. Defendant has pleaded not guilty and has filed this motion pursuant to Federal Rule of Criminal Procedure 12(b)(3) to suppress physical evidence seized from his vehicle and statements made following his arrest. This Court held an evidentiary hearing on November 14, 1994.[1] For the reasons that follow, the Court will deny defendant's motion.

---

1. The defendant did not testify at the evidentiary hearing.

## II. Findings of Fact

The court makes the following essential findings of fact as required by Rule 12(e) of the Federal Rules of Criminal Procedure. While on patrol in an unmarked vehicle on August 29, 1994, at approximately 3:15 p.m., Delaware State Police Corporal Joseph Aviola observed a white Jeep travelling in the left northbound lane of U.S. Interstate 95 near Newark, Delaware. The Jeep was passing other vehicles on the highway and appeared to be moving at a rate of speed greater than 55 miles per hour, the posted speed limit. Aviola decided to pace the Jeep to determine the Jeep's speed; he followed four to five vehicle lengths behind the Jeep for approximately one-half mile and determined the Jeep was moving at a constant rate of 70 miles per hour.[2] Because the Jeep was speeding, Aviola directed the Jeep to stop.

The Jeep pulled onto the interior, or center, shoulder of the highway, and Aviola parked his patrol car 1½ to 2 car lengths behind the Jeep. The two vehicles stopped approximately 1000 yards from the interstate service area near the Christiana highway exit. At this point, the shoulder of the highway is 10 to 12 feet wide, with a grass median separating the north and southbound lanes.

The Jeep's driver and only occupant was Reinaldo Hernandez. When Aviola approached the Jeep, Hernandez lowered the driver-side window. Aviola then detected a strong odor of air freshener, which according to his training, Aviola knew was used sometimes to hide the odor of narcotics. Upon request, Hernandez produced his New Jersey driver's license and the Jeep's registration. The Jeep was registered to "The Best of Miami Printing, Inc.," with a business address at 1801 W. Flagler, in Miami, Florida. Exhibit ("Exh.") 1. As Hernandez produced these documents, Aviola observed that Hernandez's left hand was shaking.

Aviola then asked Hernandez to step outside the Jeep so that they could speak between the Jeep and the patrol car on the shoulder of the highway. Hernandez agreed and exited the vehicle. At that time, Aviola observed an air freshener under the dashboard and a radar detector, switched to the "on" position, on the dashboard.

After Aviola explained that he had stopped Hernandez for travelling above the speed limit, Hernandez replied in English that he believed the speed limit was 65 miles per hour and that he was travelling at 65 to 70 miles per hour. Based on Hernandez's response, Aviola, who does not speak Spanish, suspected that English may not have been Hernandez's first language and asked Hernandez if he spoke English. Hernandez replied, "Yes." Aviola then told Hernandez to interrupt if at any time Hernandez did not understand anything spoken to him. Hernandez replied, "Okay."

Aviola next asked Hernandez, "How is your driving record?" Hernandez responded, "okay," but as he did so, he looked away and avoided eye contact. When asked where he came from, Hernandez told Aviola that he had immigrated from Cuba and that he held permanent resident status. Hernandez then produced his resident alien card, and, again, his hands shook visibly.

Aviola next asked Hernandez who owned the Jeep. Hernandez replied, "my company." When Aviola asked the name of the company, however, Aviola "really saw a change" as Hernandez grew tense, looked toward the nearby service area, and replied that he did not know who owned it. Hernandez similarly could not give the street address of the business on the registration card, although he did state that it was in Miami. Aviola then asked the nature of the company's business. After pausing and looking away, Hernandez replied, "Deliveries."

Hernandez's uncertain answers caused Aviola to begin to suspect that Hernandez was being less than truthful. He next asked where Hernandez's trip began. Hernandez again hesitated and replied, "Um, Miami." Hernandez also stated that he had left New Jersey a few days earlier to see friends in Miami and that, after completing his visit in

---

2. Aviola testified that the speedometer of his patrol car is calibrated once per quarter. The speedometer was calibrated in June and September 1994. The September calibration revealed that the speedometer functioned accurately and with zero deviation from the indicated speed.

Miami, he had driven non-stop north from Florida. Aviola found this statement suspicious, because he believed it uncommon for an individual to drive the 20–plus hours from Miami to Delaware non-stop. Next, when asked why he did not take his family, Hernandez replied, "I don't know."

Throughout this conversation, Aviola noticed that Hernandez appeared extremely nervous, had shaking hands, and avoided eye contact. Coupled with Hernandez's vague answers concerning the company listed as the owner for the Jeep, Aviola suspected criminal activity and decided to question Hernandez further and to ask his consent to search the Jeep. Pursuant to Delaware state police practice, as well as to question Hernandez in a quieter environment, Aviola asked Hernandez to join him in the Delaware State Police patrol car. Hernandez consented. Aviola then performed a pat-down search of Hernandez's pockets and waistband to ascertain whether Hernandez was carrying any weapons. Aviola placed Hernandez in the right rear seat of the patrol car, with the right rear window partially rolled down. The patrol car's rear passenger area door handles did not operate from the interior.

Once inside the patrol car, Aviola asked Hernandez if he would consent to a search of the Jeep. Hernandez replied, "Sure, go ahead and look." Aviola asked Hernandez whether he could read Spanish or English better. Hernandez replied Spanish, and Aviola began to fill out a standard Spanish Language Delaware State Police Consent to Search Form. Exh. 3. Aviola entered his own name, Hernandez's name, the vehicle make, model, year, and tag number, and their location. After he completed the form, Aviola explained the nature of the form to Hernandez and specifically noted that the form was not a traffic ticket. He indicated that Hernandez should read the form, and, if he still desired to consent to the search, to sign the form. Aviola also told Hernandez that he had the right to refuse to consent.

Aviola then handed the form to Hernandez; at the same time, he returned the Hernandez's vehicle registration, driver's license, and resident alien card. Hernandez appeared to read the form, and after approximately 30 seconds, signed it. Hernandez made no indication that he did not understand the form and had no apparent difficulty in understanding the form. Then, to ensure Hernandez's physical safety from traffic on the interstate, as well as to prevent any risk of harm from Hernandez during the search, Aviola requested Hernandez to remain in the patrol car during the search of the Jeep.

Aviola removed the keys from the Jeep's ignition and opened the rear cargo hatch. He discovered an unlocked blue duffle bag, which, in Aviola's judgment, weighed more than normal for its size. Suspecting the presence of contraband, Aviola unzippered the bag and found several clear plastic bags and two white towels. Each bag appeared to contain smaller clear plastic bags which, in turn, appeared to contain a white substance that Aviola suspected was cocaine. Field tests later indicated that the white substance was in fact cocaine, with a total weight of approximately 6 kilograms.

As Aviola returned to the patrol car to arrest Hernandez, he realized that Hernandez had fled. Apparently, Hernandez had reached through the open rear window and opened the door from the outside. Aviola radioed other Delaware State Police officers, who, along with Aviola, conducted an unsuccessful search for Hernandez. The officers then had the Jeep towed to Delaware State Police Troop 6 and searched the vehicle thoroughly, but found no other contraband.

Several hours later, Aviola entered the service area on Interstate 95 just north of the location from which Hernandez had fled earlier in the day. The time now was approximately 7:20 p.m. As Aviola drove past the northbound entrance to the service area, he observed Hernandez standing in the parking lot. Aviola approached Hernandez, and Hernandez again fled. This time, Hernandez did not escape; Aviola caught Hernandez following a short foot pursuit, arrested him, and walked him back to the patrol car. Aviola immediately attempted to advise Hernandez of his *Miranda* rights, but Hernandez, for the first time, replied, "No hablo," which Aviola understood to mean that Hernandez disclaimed any ability to understand English.

Aviola drove Hernandez to the Delaware State Police Troop 6. At Troop 6, Aviola inventoried Hernandez's personal property. He found a wallet containing $120, a pager, and a receipt from the gift shop at the Interstate 95 service area. The receipt from the service area indicated that someone had purchased a hat and shirt at 3:41 p.m. on August 29, 1994. At the time of his arrest, Hernandez was wearing a blue tee-shirt with "Delaware" written on it and a white baseball cap with "Washington D.C." written on it. The shirt still had a price tag affixed to it, which matched the price found on the receipt. Hernandez had not worn the shirt or the hat when Aviola had stopped the Jeep on Interstate 95 earlier in the day.

Meanwhile, New Castle County Police Department Patrolman Gustavo Zeissig, who speaks fluent Spanish,[3] came to Troop 6 to speak with Hernandez. When Zeissig asked Hernandez if he spoke English, Hernandez replied, "I understand some, but it has to be spoken slowly." Zeissig then advised Hernandez of his *Miranda* rights in Spanish and Hernandez asked Zeissig, "What should I do?" Zeissig replied that he could not tell him what to do, re-explained his *Miranda* rights, advised him of the severity of the charges, and again asked him what he wanted to do. Hernandez did not request a lawyer. He finally stated that he "wanted to tell what happened," but that he "did not know how much to tell." Zeissig told Hernandez to explain "your side of the story."

Hernandez stated that a Colombian named Tony had asked him to drive the Jeep to New York in exchange for $500. In New York, Hernandez said that he was to take the Jeep to a bar at 78th and Roosevelt Avenue. Zeissig then asked the name of bar; Hernandez did not know the name. Instead, he said that he was instructed to leave the Jeep at the bar and go home. With this answer, Hernandez became visibly nervous and fidgety and asked for a glass of water. Hernandez was given the water, and Zeissig again asked the name of the bar. Hernandez again replied that he could not remember. Zeissig next asked the name of the person who was to meet Hernandez at the bar. Instead of

replying, Hernandez asked to make a telephone call; Zeissig granted this request. Hernandez apparently called his wife, and Zeissig heard Hernandez say that he had been "caught" and that he would not return home soon.

At this time, Zeissig completed his interview of Hernandez. Hernandez was given something to eat and told that a Drug Enforcement Agency (DEA) agent wished to interview him. When the DEA agent arrived at 9 p.m., Hernandez was again read his *Miranda* rights in Spanish and told that a federal agent wished to question him. For the first time, Hernandez stated that he wished to speak with an attorney and that he had heart problems, that he had been prescribed heart medication, and that he now needed that medication. At that time, all questioning of Hernandez ceased and Hernandez was taken to a hospital for medical care.

### III. Discussion

In his motion to suppress, Hernandez raises five distinct arguments. First, Hernandez challenges the validity of any consent given to search the Jeep, asserting that Aviola unlawfully detained him. D.I. 17 at 6–7. Second, Hernandez asserts that, even if lawfully detained, he did not voluntarily consent to the search. D.I. 17 at 8. Third, Hernandez asserts that even if his consent was valid, any search of his duffel bag exceeded the scope of the consent. D.I. 17 at 9–10. Fourth, Hernandez argues that his statements are fruits of his unlawful detention. D.I. 17 at 10–12. Lastly, he argues that he did not receive his *Miranda* warnings, thereby vitiating the validity of any statements made following his arrest. D.I. 17 at 12.

### A. Lawful Detention

The courts will not disturb an individual's voluntary consent to search if the individual is lawfully detained at the time he gives his consent. *Florida v. Royer*, 460 U.S. 491, 502, 103 S.Ct. 1319, 1326–1327, 75 L.Ed.2d 229 (1983). Defendant contends that Aviola stopped and detained him "for a traffic violation that did not occur." D.I. 17

---

3. Officer Zeissig was born in Puerto Rico and his original language was Spanish.

at 6. Defendant further contends that Aviola's "actions ... went far beyond a 'Terry' [sic] stop and thus required probable cause." *Id.* at 7. The Court disagrees with these assertions and finds that Aviola acted within the strictures of the Fourth Amendment while eliciting consent to search the Jeep from Hernandez.

■ The Fourth Amendment of the United States Constitution permits law enforcement officials to stop an automobile if the official has an articulable and reasonable suspicion that the vehicle or driver is travelling in violation of the law. *Delaware v. Prouse,* 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660 (1979); *United States v. Velasquez,* 885 F.2d 1076, 1081 (3d Cir.1989), *cert. denied,* 494 U.S. 1017, 110 S.Ct. 1321, 108 L.Ed.2d 497 (1990). Whether an articulable and reasonable suspicion exists "turns on an objective assessment of the officers's actions in light of the facts and circumstances confronting him." *Maryland v. Macon,* 472 U.S. 463, 470, 105 S.Ct. 2778, 2783, 86 L.Ed.2d 370 (1985) (quoting *Scott v. United States,* 436 U.S. 128, 136, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978)); *see also United States v. Brignoni–Ponce,* 422 U.S. 873, 884, 95 S.Ct. 2574, 2582, 45 L.Ed.2d 607 (1975) (officers must rely on "specific articulable facts, together with rational inferences from those facts"). In making this determination, the courts should consider "'the totality of the circumstances—the whole picture.'" *United States v. Sokolow,* 490 U.S. 1, 8, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (quoting *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 694–695, 66 L.Ed.2d 621 (1981)).

The Court credits the testimony of Corporal Aviola and finds that the defendant was travelling at 70 miles per hour on U.S. Interstate 95, which had a posted speed limit of 55 miles per hour in Delaware. Aviola witnessed defendant's Jeep pass other vehicles on the highway and Aviola personally followed, or paced, defendant's Jeep for approximately one-half mile. While pacing defendant, Aviola calculated the Jeep's speed based on the patrol car's calibrated speedometer. The Court finds that these two events would give an objective officer an articulable and reasonable suspicion that the defendant's Jeep was travelling in violation of 21 Del.C. § 4169, which prohibits travel in excess of 55 miles per hour on a four-lane highway.[4]

■ Even if an individual is lawfully detained for a traffic violation, the officer may detain the individual only for that period necessary to investigate the traffic violation. *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325–1326, 75 L.Ed.2d 229 (1983) ("an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop"). During the investigation, an officer may question the stopped individual concerning the traffic violation, but the officer may not, for example, use the stop to question the individual concerning other unrelated potentially criminal activity. *Berkemer v. McCarty,* 468 U.S. 420, 439, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984) (discussing Fifth Amendment boundaries on questioning during a routine traffic stop). If, however, during questioning related to the routine traffic stop, the officer identifies articulable facts that create reasonable suspicion of additional criminal activity, the officer may continue to detain the driver and investigate the facts giving rise to the additional suspicion. *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968); *United States v. Sanchez–Valderuten,* 11 F.3d 985, 989 (10th Cir.1993). Again, the officer may ask "a moderate number of questions ... to try to obtain information confirming or dispelling the officer's suspi-

---

4. Defendant does not claim in either his Motion to Suppress, D.I. 16, or in his Brief in Support of the Motion, D.I. 17, that Aviola used the alleged speeding violation as a pretext to stop defendant and enable Aviola to detain and search defendant for narcotics. Fairly read, defendant instead appears to argue that no speeding violation in fact occurred. *See* D.I. 17 at 6 ("Here, the defendant was stopped and detained, according to Special Agent Aviola, for a traffic violation which did not occur."); D.I. 16 at ¶ 2. Also, defendant does not cite nor argue any case law that indicates he believes that the stop was pretextual. In any event, as the body text indicates, the facts in this case are sufficient to find that Aviola acted without pretext in stopping the defendant for a speeding violation. *United States v. Hawkins,* 811 F.2d 210, 213–215 (3d Cir.), *cert. denied,* 484 U.S. 833, 108 S.Ct. 110, 98 L.Ed.2d 69 (1987).

cions." *Berkemer v. McCarty,* 468 U.S. at 439, 104 S.Ct. at 3150. The same totality of the circumstances test initially used to determine whether an articulable and reasonable suspicion exists applies once more.

■ The Court finds that Aviola, during the course of routine questioning integrally related to the speeding violation, acquired reasonable suspicion to believe that defendant was engaged in transporting narcotics. First, at the time of the stop, Aviola smelled a strong odor of air freshener; he observed the air freshener when the defendant stepped from the Jeep. Aviola knew from his experience that air fresheners are often used to conceal the scent of cocaine, heroin, and marijuana. Second, the defendant could not answer, or answered equivocally, many of Aviola's routine questions. For example, he did not know the name, address, or line-of-business of his "company." Third, throughout Aviola's questioning, the defendant's hands shook visibly, indicating to Aviola nervousness and a desire to conceal information. Fourth, defendant paused frequently and avoided eye contact prior to stating, in response to various routine questions, "I don't know."[5] While it is true that any one of these facts, taken alone, would not necessarily create a reasonable suspicion of criminal activity, the Court finds that in this case, viewing the totality of the circumstances, these facts could create in an objective law enforcement officer a reasonable suspicion that the defendant was engaged in transporting narcotics. The Fourth Amendment, therefore, did not prohibit Aviola's continued detention and questioning of the defendant.

■ At oral argument, the Court questioned counsel and asked for supplemental briefing as to whether Aviola exceeded the scope of detention permitted on the basis of reasonable suspicion when he placed the de-

fendant in the patrol car. In doing so, the Court referred the parties to *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion). In *Royer,* law enforcement officers stopped the defendant in an airport concourse and questioned him concerning his travels. During this questioning, the officers developed an articulable and reasonable suspicion that Royer was carrying drugs. The officers then moved Royer to a small room for further questioning and there obtained his consent to search his luggage. *Id.* at 493–95, 103 S.Ct. at 1321–1323. In light of these events, Florida argued that the officers acted within the bounds permitted by their reasonable and articulable suspicion of criminal activity. The Supreme Court plurality disagreed. *Id.* at 502, 103 S.Ct. at 1326–1327. While the Court held that the officers could have justifiably detained Royer and continued questioning him *in the airport concourse,* including a request to search the luggage, the plurality held that, at the time consent was given, "the detention to which he was then subjected was a more serious intrusion on his personal liberty than is allowable on mere suspicion of criminal activity." *Id.*

After reviewing the parties' submissions, as well as conducting independent research, the Court concludes that Officer Aviola did not overstep the bounds of action permitted by reasonable suspicion of criminal activity. First, in *Royer* itself, the Supreme Court recognized that legitimate law enforcement reasons, including safety and security, permit law enforcement officials to move a suspect from one location to another during the course of a stop based on reasonable suspicion. *Id.* at 504, 103 S.Ct. at 1328. In fact, this type of movement occurred not once, but twice, in this case; the movement first occurred when Aviola asked the defendant to step from the vehicle during the initial stop.[6]

5. Defendant implied during Aviola's cross-examination that defendant's responses were consistent with those that may be given by an individual who did not speak English. Additionally, defendant elicited credible testimony from José Paéz, the brother of defendant's son-in-law and the Manager of Budget Rent–A–Car's LaGuardia Airport operations, to the effect that defendant has poor or non-existent English-language skills. Nevertheless, the Court finds that defendant objectively manifested an ability to converse in En-

glish at the time Aviola stopped the Jeep. The Court bases this finding on defendant's statement that he spoke English and his apparent understanding of Aviola's questions, as evidenced by his responsive replies.

6. Aviola testified that he routinely asks individuals stopped for traffic violations to step outside their vehicles. Aviola bases this routine practice on personal safety considerations. He also testi-

Likewise, once Aviola formed an articulable and reasonable suspicion of possible narcotics transportation, the Court finds that Aviola followed standard Delaware State Police practice in asking the defendant to join him in the patrol car. Although the exact nature of this policy remained unexplained at the hearing, the Court surmises from other cases involving similar acts by the Delaware State Police that safety, convenience, and security reasons underlie the policy. *See, e.g., United States v. Ospina,* 679 F.Supp. 402, 408 (D.Del.1988) (suggesting a safety rationale).

Second, and more important, the overreaching and coercion that made the detention in *Royer* and the cases cited by the defendant more like an arrest requiring probable cause than an investigatory detention requiring only reasonable suspicion simply do not exist in this case. *See, e.g., United States v. Richardson,* 949 F.2d 851 (6th Cir.1991); *United States v. Ricardo D.,* 912 F.2d 337 (9th Cir.1990); *United States v. Chamberlin,* 644 F.2d 1262 (9th Cir.1980), *cert. denied,* 453 U.S. 914, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981). In *Royer,* for example, law enforcement officers held Royer's plane ticket, identification, and luggage, and they never informed Royer that he was free to board his plane if he decided to do so. *Florida v. Royer,* 460 U.S. at 503, 103 S.Ct. at 1327. Instead they took him to a private room to ask consent; this concurrence of events, the Court held, was akin to an arrest. *Id.* In *United States v. Ricardo D.,* cited by the defendant, law enforcement officers took a juvenile by the arm, told him not to run, placed him in the back of a patrol car, and threatened to arrest him if he provided false information. 912 F.2d at 342. In that case, the Ninth Circuit found, focussing in particular on the defendant's young age, that these events, taken together, created a coercive, arrest-like atmosphere "unacceptable as part of a *Terry* stop, and unsupportable on anything less than probable cause." *Id.*

Aviola's request for the defendant to sit in the patrol car does not evoke the coercive atmosphere found in *Royer* and the other

cases cited by defendant. First, the encounter occurred along a public highway, during the daytime. *United States v. Velasquez,* 885 F.2d 1076, 1082 (3d Cir.1989), *cert. denied,* 494 U.S. 1017, 110 S.Ct. 1321, 108 L.Ed.2d 497 (1990). Second, Aviola returned the defendant's driver's license, vehicle registration, and resident alien card prior to obtaining the defendant's written consent to search. This is important because the defendant, at that time, regained control of the documents required to leave the scene if he so desired. *See e.g., Florida v. Royer,* 460 U.S. at 504, 103 S.Ct. at 1328. Third, Aviola explained to the defendant that he could refuse to consent to the search. This is also important because, while the Fourth Amendment does not require Aviola to notify defendant of his right to refuse, defendant's knowledge of his right to refuse ranks positively in the balance of facts that may countermand a finding of unlawful detention and government coercion. *Cf. Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2047–2048, 36 L.Ed.2d 854 (1973). Finally, the Court finds no evidence of threats or coercion by Aviola in asking the defendant to enter the patrol car or to give his consent once inside. Aviola did not unholster his weapon and apparently took pains to insure that the defendant understood his right to refuse to consent. *See supra* pages 1290–1291. In sum, the Court finds that placing the defendant in the patrol car did not "constitute the degree of custody associated with formal arrest in terms of its impact on consent" and that Aviola's actions did not exceed permissible investigatory limits. *United States v. Velasquez,* 885 F.2d at 1082. *See id.* (noting that asking suspect to sit in patrol car constituted "reasonable investigative detention"); *cf. United States v. Ospina,* 679 F.Supp. at 408–409 (holding that simple fact defendant in patrol car at time of consent did not create coercive atmosphere); *United States v. Cabrera,* Cr. No. 88–44–JRR, slip op. at 10–11 (D.Del. Feb. 1, 1989) (finding brief interview and consent given in patrol car voluntary and "well within the bounds of what is constitutionally permissible in connection with a valid traffic stop"); *see*

fied that his request is just that—a request; individuals have refused to honor Aviola's request,

and Aviola has respected that refusal.

*generally United States v. Fong,* 662 F.Supp. 1319, 1320, 1323 (D.Del.1987); *United States v. Cardona,* Cr. No. 86–72 MMS, slip op. at 3, 9–10 (D.Del. Dec. 1, 1986).

In sum, Aviola did not subject the defendant to an unlawful detention at any time as he sought defendant's consent to search to Jeep. Aviola had reasonable suspicion to stop the Jeep for a traffic violation. An articulable and reasonable suspicion developed during the initial stop to reasonably cause Aviola to believe that defendant was transporting narcotics. Aviola then acted within the constitutionally permissible bounds of the Fourth Amendment while he elicited consent to search the Jeep. The Court therefore rejects defendant's claim that Aviola violated his Fourth Amendment rights against unlawful seizure.

## B. Involuntary Consent

 Defendant next asserts that he did not voluntarily consent to the search of the Jeep. He claims that he did not understand English, that sitting in the patrol car made any consent involuntary, and that the events as related by Aviola are inaccurate.

 Law enforcement officials can make warrantless searches with valid consent. *Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973); *United States v. Kim,* 27 F.3d 947, 955 (3d Cir.1994), *petition for cert. filed,* No. 94–748, 63 U.S.L.W. 3371 (U.S. Oct. 25, 1994). Looking at the totality of the circumstances, the government must show by a preponderance of the evidence that the consent to search was voluntary. *United States v. Velasquez,* 885 F.2d 1076, 1081 (3d Cir. 1989), *cert. denied,* 494 U.S. 1017, 110 S.Ct. 1321, 108 L.Ed.2d 497 (1990). The test for voluntariness considers "whether, under the circumstances, the consent was an exercise of free will or whether the actor's free will 'has been overborne and his capacity for self-determination critically impaired.'" *United States v. Antoon,* 933 F.2d 200, 203 (3d Cir.), *cert. denied,* 502 U.S. 907, 112 S.Ct. 300, 116 L.Ed.2d 243 (1991) (quoting *Schneckloth v. Bustamonte,* 412 U.S. at 225, 93 S.Ct. at 2046–2047). The Third Circuit Court of Appeals has instructed that courts evaluating

voluntariness should refer to "all relevant factors, without giving dispositive effect to any single criterion." *United States v. Kim,* 27 F.3d at 955. Relevant factors include, non-exhaustively, the age of the accused, his education, his intelligence, whether he was advised of his right to refuse to consent, and whether the questioning was repeated and prolonged. *Id.; Schneckloth v. Bustamonte,* 412 U.S. at 226, 93 S.Ct. at 2047.

The Court credits Aviola's testimony as to the sequence of events during the stop. The circumstances of Aviola's and defendant's interaction during the stop establish that Hernandez could understand English. Defendant replied to Aviola's questions in English, including a statement in English to the effect of "[s]ure, go ahead and search my car." From these statements, the Court also concludes that the defendant understood Aviola's instruction that the defendant could refuse to consent. Further, to ensure defendant's understanding, Aviola provided a Spanish language consent to search form, which the defendant appeared to read before he signed it. The defendant never indicated that he did not or could not understand that he was consenting to a search. *See also supra* note 5. Finally, the Court finds no evidence that Aviola would have detained the defendant further if he did refuse to consent to the search. *Cf. Florida v. Royer,* 460 U.S. 491, 503, 103 S.Ct. 1319, 1327, 75 L.Ed.2d 229 (1983).

The Court further finds that Aviola did not apply any physical duress or coercion to induce defendant's consent. No evidence suggests that Aviola subjected the defendant to repeated or prolonged questioning. The Court also finds that, if anything, Aviola's return of the defendant's drivers license, vehicle registration, and resident alien card lessened any adverse psychological impact of asking defendant to sit in the patrol car. *Cf. Florida v. Royer,* 460 U.S. at 504, 103 S.Ct. at 1328 ("by returning his ticket and driver's license, and informing him that he was free to go if he so desired, the officers may have obviated any claim that the encounter was anything but a consensual matter from start to finish"). In sum, under the totality of the circumstances, the Court finds that the de-

fendant voluntarily consented to the request to search his vehicle.[7]

## C. Scope of Consent

■ The defendant next contends that his general consent to search the Jeep did not extend to containers found within the Jeep. He also contends that the Spanish language consent form does not mention the word "containers" and therefore did not authorize Aviola's search of the duffle bag.

■ Once general lawful consent is given to search a vehicle, the consent is deemed to include containers found within the vehicle, provided that the searched container could conceivably hold the object of the government's search. *Florida v. Jimeno*, 500 U.S. 248, 251, 111 S.Ct. 1801, 1803–1804, 114 L.Ed.2d 297 (1991); *United States v. Kim*, 27 F.3d 947, 956 (3d Cir.1994), *petition for cert. filed*, No. 94–748, 63 U.S.L.W. 3371 (U.S. Oct. 25, 1994). Defendant argues that *Jimeno* does not apply, however, because "[g]eneral permission to search does not include permission to search containers." D.I. 17 at 9. Defendant argues that *United States v. Infante–Ruiz*, 13 F.3d 498 (1st Cir.1994), supports this proposition. In *Infante–Ruiz*, the First Circuit Court of Appeals addressed a general consent to search a vehicle, exactly paralleling the present scenario. Under the

7. The Court would also find that defendant freely and voluntarily gave his consent to search, even if Aviola's placement of defendant in the patrol car constituted an illegal seizure for Fourth Amendment purposes. When a Fourth Amendment violation precedes consent to search, consent may nevertheless cure the violation, provided the consent constitutes an intervening act of voluntariness or free expression. *Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S.Ct. 407, 417–418, 9 L.Ed.2d 441 (1963); *cf. Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (upholding confession as intervening act of free will from primary Fourth Amendment violation). Following a Fourth Amendment violation, however, the government may "carry a heavier burden" to establish voluntariness. *United States v. Fong*, 662 F.Supp. 1319, 1323 (D.Del.1987). Following the lead of *Brown v. Illinois*, both the Fifth and Tenth Circuits have held that consent preceded by a Fourth Amendment violation must be voluntary in fact. *United States v. Guzman*, 864 F.2d 1512, 1520, 1520 n. 9 (10th Cir.1988); *United States v. Ruigomez*, 702 F.2d 61, 65 (5th Cir.1983) (requiring proof of "actual, valid consent").

The Tenth Circuit has applied a series of factors derived from *Brown v. Illinois* to determine whether consent is voluntary in fact. *See United States v. Guzman*, 864 F.2d at 1520. Recognizing that the Supreme Court derived these factors in the context of determining whether a confession preceded by a Fourth Amendment violation was voluntary, the Court adopts these factors to determine whether the defendant's consent vitiated any Fourth Amendment violation. Specifically, these factors include "[t]he temporal proximity of the arrest and the [consent], the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct." *Brown v. Illinois*, 422 U.S. at 603–604, 95 S.Ct. at 2261–2262 (citation omitted) (footnotes omitted). *See also United States v. Guzman*, 864 F.2d at 1520–1521.

Analyzing these factors, no question exists that, temporally, the defendant's consent closely followed Aviola's request to sit in the patrol car. The second and third factors, however, weigh heavily in favor of finding actual, voluntary consent. First, Aviola gave every opportunity to the defendant to refuse to consent. Aviola twice asked him to consent orally—before filling out the written consent form and before asking the defendant to read and sign the form. Any questions as to the defendant's English language ability are moderated by the Spanish language form; all evidence at the hearing suggests the defendant read and understood the form. Second, Aviola specifically told the defendant he had the right to refuse to consent. Aviola also returned the defendant's driver's license, vehicle registration, and resident alien card, giving the defendant control over the Jeep and the ability to refuse to consent and drive away, which in part offsets any coercive atmosphere present in the patrol car. *Florida v. Royer*, 460 U.S. at 504, 103 S.Ct. at 1328. Third, and most important, the Court finds no bad faith or flagrant misconduct on the part of Aviola in placing defendant in the patrol car. Aviola testified, and the Court accepts, that his request for consent could have been refused. *See supra* note 6. Aviola also was following standard state police procedure, which, even if not in fact required by safety or security in this instance, certainly does not indicate an attempt by Aviola to overreach and coerce the defendant to consent to a search. Additionally, the consent forms were kept in the patrol car, and the Court finds the patrol car as legitimate a location as any for Aviola to fill out the form and ask the defendant if would like to sign it. In sum, the Court finds no bad faith or intent on the part of Aviola to coerce defendant to consent. The Court therefore finds that Hernandez's consent to search was voluntary in fact.

Finally, although the Court finds the defendant's consent voluntary in this instance, the Court notes that these potentially dispositive questions of unlawful detention and voluntariness of consent would not have arisen had Aviola simply asked consent to search the Jeep while he and the defendant stood on the roadside.

specific facts of *Infante–Ruiz,* the court excluded evidence found in a locked briefcase because the consenting party told the searching officer that the briefcase belonged to a different occupant of the vehicle. *Id.* at 505. Absent this fact, however, the *Infante–Ruiz* court stated that *Jimeno* normally would sanction the search of containers found pursuant to a general consent to search. *Id.*

This Court rejects defendant's argument. While it is true that in *Jimeno* the officer stated his intent to search for narcotics, the Supreme Court did not require the officer asking consent to delineate the purpose of the search prior to asking consent. *See United States v. Jimeno,* 500 U.S. at 251–252, 111 S.Ct. at 1803–1804. According to the Court, "if his consent would reasonably be understood to extend to a particular container, the Fourth Amendment provides no grounds for requiring a more explicit authorization." *Id.* at 252, 111 S.Ct. at 1804.[8]

In this case, Aviola elicited both oral and written consent from the defendant, and the defendant did not delimit either his oral or written consent to exclude containers. In response to Aviola's oral request to search the Jeep, for example, the defendant simply stated "[s]ure, go ahead and look," without limitation as to containers found within the Jeep. Likewise, the Spanish language consent form signed by defendant authorized a "complete" search of the vehicle. When viewed together, the written and oral consent would lead a reasonable person to believe the consent extended to containers such as the duffle bag, particularly when "[a] reasonable person may be expected to know that narcotics are generally carried in some form of a container." *Id.* at 251, 111 S.Ct. at 1804.

Defendant replies that the consent form includes a list of objects that may be searched, and that, because this list does not mention the word containers, his written consent did not extend to the duffel bag. First,

even if the court accepted defendant's argument, defendant's oral consent had no limitation as to containers and would support Aviola's search of the duffel bag. Regardless, it is of no moment that the consent form did not mention "containers." Fairly read, the portion of the consent form cited by defendant does not delineate those articles that may be searched; it instead lists the items that the form's signor authorizes the "Delaware State Police to remove." Exh. 4.[9] The Court therefore finds that the language of the consent form itself did not constrain the scope of the search.

## D. Fruits of the Detention

■ Defendant next contends that "[a]ny and all statements must be suppressed because they were obtained as the result of an unlawful detention." D.I. 17 at 10 (emphasis omitted). The basic standard for evaluating the admissibility of evidence gathered following a Fourth Amendment violation is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). The Court has found previously that Corporal Aviola did not violate defendant's Fourth Amendment rights prior to his arrest. *See supra* sections III.A, III.B, and III.C. Additionally, because the Fourth Amendment permits public warrantless arrests when the arresting officer has probable cause of wrongdoing, *United States v. Watson,* 423 U.S. 411, 421–424, 96 S.Ct. 820, 826–828, 46 L.Ed.2d 598 (1976), Aviola properly seized the defendant at the service area. At the time Aviola arrested defendant at the service area, the cocaine found in the vehicle controlled by the defendant created probable cause for Aviola to suspect defen-

---

**8.** Nevertheless, the Court notes that general consent to search a vehicle does not give the government free rein to conduct an unlimited search. As with any search, its scope must be limited to those areas that could reasonably conceal the object of the search. *United States v. Ross,* 456 U.S. 798, 821–822, 102 S.Ct. 2157, 2170–2172, 72 L.Ed.2d 572 (1982).

**9.** The Court finds, based on the testimony of Patrolman Zeissig, that the English language consent form, Exh. 4, is identical in content and meaning to the Spanish language consent form, Exh. 3, signed by the defendant.

dant was engaged in criminal activity. Defendant cannot establish a "primary illegality," and the Court rejects defendant's attempt to exclude his statements on the basis of *Wong Sun* and its progeny.

## E. Lack of *Miranda* Warnings

■■■■ Lastly, defendant argues that he never received his *Miranda* warnings, either in English or in Spanish. Defendant makes a correct statement of law when he argues that law enforcement officers must give *Miranda* warnings to persons subject to custodial interrogation so as to "dispel the compulsion inherent in custodial surroundings." *Miranda v. Arizona*, 384 U.S. 436, 458, 86 S.Ct. 1602, 1619, 16 L.Ed.2d 694 (1967). When law enforcement officials fail to give adequate *Miranda* warnings, or fail to give any *Miranda* warnings whatsoever, any statement made by a person subject to custodial interrogation becomes inadmissible at trial. *Rhode Island v. Innis*, 446 U.S. 291, 297, 100 S.Ct. 1682, 1687–1688, 64 L.Ed.2d 297 (1980).

In this case, however, the Court credits the testimony of Corporal Aviola and Patrolman Zeissig and finds that the defendant received his Miranda warnings prior to each period of questioning following his arrest. The Court finds that Aviola read defendant his *Miranda* warnings in English immediately following defendant's arrest at the service area. After defendant indicated that he did not understand English, all questioning ceased and did not resume until Zeissig read defendant his *Miranda* warnings in Spanish at Troop 6. The Court also finds that when the DEA agent arrived, Zeissig re-read the *Miranda* litany to defendant. The Court therefore rejects defendant's assertion that he never received his *Miranda* rights.[10]

10. Finally, although defendant does not assert that he did not knowingly, voluntarily, and intelligently waive his *Miranda* rights, the Court finds by a preponderance of the evidence that defendant did voluntarily, knowingly, and intelligently waive his *Miranda* rights. *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1140–1141, 89 L.Ed.2d 410 (1986). First, defendant does not assert, and the Court does not find, evidence of ill-treatment or threats to induce defendant to speak; his waiver was therefore voluntary. Sec-

## IV. Conclusion

Based on the facts adduced from the suppression hearing and for the reasons given above, the Court will deny defendant's motion to suppress.

ond, defendant heard his *Miranda* warnings in both Spanish and English. Third, the Court finds that the defendant knew how to invoke his *Miranda* rights when the DEA agent arrived to question him, indicating that the defendant understood his *Miranda* rights. Again, the Court finds by a preponderance of the evidence, *United States v. Swint*, 15 F.3d 286, 289 (3d Cir.1994), that defendant made a knowing, intelligent, and voluntary waiver.