**UNITED STATES of America**

v.

**Robert VALDEZ LEAL, Defendant.**

**No. CRIM. 3:04–28J.**

United States District Court, W.D. Pennsylvania.

Aug. 29, 2005.

Marketa Sims, Federal Public Defender's Office, Pittsburgh, PA, for Defendant.

John J. Valkovci, Jr., U.S. Attorneys, Johnstown, PA, for Plaintiff.

## *MEMORANDUM OPINION AND ORDER*

GIBSON, District Judge.

### SYNOPSIS and FINDINGS OF FACT

This case comes before the Court on Robert Valdez Leal's (hereinafter "Defendant") Motion for Discovery and to Suppress Evidence (Doc. No. 19). Upon consideration of Defendant's motion, the Response by the United States of America (Doc. No. 22), and a hearing on Defendant's motion (Doc. Nos. 31 & 32), the Court makes the following Findings of Fact:

1. On February 2, 2004, the Defendant was driving his Chevrolet Blazer in Somerset County, Pennsylvania east on Interstate 76 toward Philadelphia, Pennsylvania.

2. On the same date, State Police Officer Michael J. Volk (hereinafter "Officer

Volk") was performing a routine patrol along Interstate 76 in an unmarked police vehicle. Officer Volk observed that the Defendant's Chevrolet Blazer was in violation of 75 Pa.C.S. § 4524 of the Vehicle Code.[1] At approximately 1:30 p.m., Officer Volk stopped the Defendant for the window tint violation. At the time of the stop, Officer Volk had no reason to suspect that the Defendant was engaged in any other illegal activity.

3. Officer Volk observed that the driver's side window did not roll down, and the Defendant had to open the driver's side door to communicate with Officer Volk.

4. Upon Officer Volk's request for the Defendant's driver's license and vehicle registration information, the Defendant produced the following documents: (1) a driver's license; (2) a document from State Farm Life Insurance Company, one side of which states that the name of the insured is Victor Bennet, and on the reverse side of the document is a receipt of payment dated May 9, 2003 for $205.68 for a multicar insurance policy; (3) an insurance cancellation notice with the Defendant's name and a description of the 1992 Chevrolet Blazer which the Defendant was operating at the time of the traffic stop; (4) three Texas insurance liability cards for the 1992 Chevrolet Blazer; and (5) a State Farm Insurance Company's receipt of payment for $205.00 dated December 1, 2003 for a multicar insurance policy.

5. A second state police officer arrived at the scene during the traffic stop of the Defendant Using the computer inside of the second officer's police vehicle, Officer Volk performed the following routine checks: (1) whether the registration of the Defendant's vehicle was valid; (2) whether there were any outstanding warrants on the vehicle; and (3) whether the Defendant had a criminal history. Officer Volk also performed checks using his department issued cellular telephone.[2] He con-

---

1. 75 Pa.C.S. § 4524 provides in relevant part:
 § 4524. **Windshield obstructions and wipers**
 (e) Sun screening and other materials prohibited.-
 (1) No person shall drive any motor vehicle with any sun screening device or other material which does not permit a person to see or view the inside of the vehicle through the windshield, side wing or side window of the vehicle.
 75 Pa.C.S. § 4524(e).

2. The Court observes that during the suppression hearing on June 27, 2005 the following joint exhibit was entered into the record:
 Records maintained by the El Paso Intelligence Center (EPIC), reflect that 11:42:19 hours Mountain Standard Time, which is 1342 hours Eastern Standard Time, on February 2nd, 2004, EPIC received a call from the Pennsylvania State Police Bureau of Criminal Investigation (PSI–BCI) requesting EPIC checks for an individual by the name of Robert Valdez Leal with a date of birth May 13, 1947. EPIC advised PSP–BCI that all EPIC checks for that name were negative.

 Records maintained by EPIC further reflect that EPIC received a telephone call from Pennsylvania State Police Trooper Michael Volk at 12:22:10 hours Mountain Standard Time, which is 1422 Eastern Standard Time, on February 2nd, 2004. Trooper Volk provided a call-back number of (814) 233–4007. Trooper Volk requested EPIC checks on (a) Robert Valdez Leal with a date of birth of May 13, 1947, and (b) a vehicle bearing license—Texas license plate 4MZM02. EPIC advised Trooper Volk that a check of their databases indicated that the vehicle in question entered the United States from Mexico at Brownsville, Texas, on 21 occasions. EPIC further advised Trooper Volk that the most recent crossing into the United States by the vehicle in question occurred on January 27th, 2004, at 1620 hours. The call between Trooper Volk and EPIC lasted approximately six minutes and thirty seconds.
 (Doc. No. 32, pp. 3–4). However, the Court also observes that records from Officer Volk's cellular telephone bill reflect that four separate telephone calls were made to EPIC on February 2, 2004. Specifically, the cellular

tacted the El Paso Intelligence Center (hereinafter "EPIC") to determine whether the vehicle operated by the Defendant had been involved with drug activity or border crossings. Officer Volk also checked whether the Defendant had been involved in criminal conduct or drug activity, border crossings, international flights, or other similar conduct.

6. Officer Volk learned that the vehicle was registered to Maria Leal, who resided at the same Brownsville, Texas address that the Defendant provided. Officer Volk also learned that the Defendant had a felony conviction in the year 2000 in Texas for illegal expenditures and investing drug money. Furthermore, the vehicle operated by the Defendant had crossed the border from the United States into Mexico on January 27, 2004, approximately six days prior to the instant traffic stop. Officer Volk testified that the duration of the computer and telephone check lasted about ten minutes. During this time, Officer Volk proceeded to prepare a written warning for the window tint violation.

7. After Officer Volk received the above listed information, he returned to the Chevrolet Blazer to speak with the Defendant. Officer Volk asked the Defendant questions regarding the expiration of Defendant's automobile insurance, and whether any other person had recently driven the Chevrolet Blazer. Consequently, the Defendant explained that he did not know why his insurance was expired, and that no other person had driven the Chevrolet Blazer for at least six months.

8. Officer Volk also asked the Defendant whether he had been in trouble with the law before, or if he had ever been arrested and fingerprinted. The Defendant responded that he had never been in trouble with the law, and he had never been fingerprinted.

9. Next, Officer Volk questioned the Defendant regarding his last trip outside of the United States. The Defendant stated that he had not been outside of the United States for at least two weeks.

10. Officer Volk then asked the Defendant about his destination and travel plans on February 2, 2004. The Defendant answered that he was traveling to Columbus, Ohio. However, noting that the Defendant was traveling eastbound on the Pennsylvania turnpike, Officer Volk indicated to the Defendant that he had missed Columbus, Ohio which was located several hundred miles to the west of the location of the traffic stop.

11. The Defendant explained to Officer Volk that he was driving to Philadelphia, Pennsylvania to visit cousins who resided there. The Defendant identified for Officer Volk specific street names and locations that he would be traveling to in Philadelphia. After his visit to Philadelphia, the Defendant stated that he intended to travel to Columbus, Ohio to pick up his ill uncle and take him to Brownsville, Texas for the winter to alleviate a medical condition.

12. During his conversation with the Defendant about his travel plans, Officer Volk testified that they were standing outside of the Chevrolet Blazer; however the door to the vehicle remained open. Officer Volk noticed a strong scent of air fresheners emanating from the Blazer, and he

telephone bill indicates that four telephone calls were made to EPIC as follows: (1) 1:36 p.m. lasting approximately one minute; (2) 2:19 p.m. lasting approximately seven minutes; (3) 3:30 p.m. lasting approximately two minutes; and (4) 10:14 p.m. lasting approxi- mately one minute. (Doc. No. 32, p. 9). Consequently, neither the United States nor the Defendant could offer an explanation as to why the cellular telephone bill records conflict with the two telephone calls reflected in EPIC's records.

observed two cellular telephones on the seat of the Blazer.

13. Throughout their conversation, Officer Volk observed that the Defendant's demeanor remained calm. Officer Volk asked the Defendant to step to the rear of the vehicle while they continued their conversation. In response to Officer Volk's request, the Defendant removed the keys from the ignition, locked the doors to the Blazer, and placed the keys in his pocket.

14. Officer Volk explained to the Defendant that the tint of the windows violated Pennsylvania law. The Defendant stated that once he arrived in Philadelphia, his uncle would help him remove the window tint.

15. Officer Volk testified that the Defendant explained he was driving to Philadelphia on that day, and then he would return to Columbus the next morning to pick up his uncle prior to returning to Texas. The Defendant stated that after he returned to Brownsville, Texas, he would straighten out the problem with the insurance documents.

16. Officer Volk asked the Defendant what his employment was in Brownsville, Texas. The Defendant stated that he was a carpenter with his cousin; however, Officer Volk observed that the Defendant's hands appeared uncut and manicured.

17. When their conversation concluded, Officer Volk returned the Defendant's documents to him, and he issued the Defendant a warning for the window tint violation. Then, Officer Volk told the Defendant that he was free to leave.

18. As the Defendant turned and walked toward the front of the Blazer, Officer Volk asked the Defendant if he would mind answering one additional question. The Defendant responded that he would answer the question.

19. Officer Volk asked the Defendant for permission to look inside the Chevrolet Blazer. However, the Defendant responded that he did not want Officer Volk to look in the vehicle. The Defendant then appeared to become agitated, stating that the only reason Officer Volk wanted to search the vehicle is because the Defendant is a Hispanic American. Furthermore, the Defendant claimed that he had consulted with an attorney prior to his trip to Pennsylvania, and the attorney advised him not to permit a search of his vehicle.

20. As the Defendant proceeded to admonish Officer Volk for alleged racial profiling, the Defendant grew more agitated. At that point, Officer Volk told the Defendant that he was going to detain him pending further investigation. Furthermore, Officer Volk stated that he was going to request that a drug detection canine be deployed to the scene.

21. Officer Volk explained to the Defendant that he believed that there was criminal activity afoot, and he was going to further his investigation by calling for a drug dog.

22. Officer Volk testified that approximately fifteen minutes elapsed between the time he initiated the traffic stop and the time he called for Trooper Robert Johnson [3] (hereinafter "Trooper Johnson") to respond to the scene with his canine. While waiting in his unmarked vehicle, Officer Volk received confirmation that Trooper Johnson was en route to Officer Volk's location.

23. After approximately forty-five minutes to one hour later, Trooper Johnson arrived at the scene of the traffic stop.

---

**3.** Since the date of the traffic stop on February 2, 2004, Trooper Robert Johnson has been promoted to Corporal Johnson. However, in the interest of clarity the Court will continue to refer to him as Trooper Johnson.

Trooper Johnson testified that his arrival at the scene was delayed due to construction and traffic on the Pennsylvania Turnpike between the New Stanton entrance and mile marker 124 where Officer Volk was waiting. Furthermore, Trooper Johnson was the only available canine unit in the Somerset County area on February 2, 2004.

24. While waiting for Trooper Johnson to arrive with the canine, the Defendant remained inside of the vehicle reading a newspaper and making telephone calls. Officer Volk remained inside of his unmarked vehicle drafting an affidavit of probable cause for a search warrant.

25. Once Trooper Johnson arrived at the scene of the traffic stop, he reported to Officer Volk to determine what should be done. Officer Volk explained that he wanted Trooper Johnson to have his canine perform an exterior drug search of the Chevrolet Blazer.

26. Before initiating the exterior search of the vehicle, Trooper Johnson requested that the Defendant exit the vehicle for his own safety. Then, Trooper Johnson deployed the canine to perform the search, which took approximately three to five minutes to complete. During the exterior search, the canine alerted and indicated on the passenger side door seam and on the driver's side door handle.

27. After Trooper Johnson communicated the canine's indications to Officer Volk, Officer Volk then explained to the Defendant that he was going to have the Chevrolet Blazer towed back to the Somerset Turnpike Barracks. Then, Officer Volk explained that he was going to secure a search warrant, execute a search of the vehicle where he believed that drugs would be found inside the Blazer. However, before leaving the scene, Officer Volk offered the Defendant an opportunity to do a controlled drug delivery in order to assist the police in arresting the individuals that were waiting for the drugs. The Defendant did not appear to be interested in cooperating with the police at that time.

28. The Blazer was then towed to the Somerset Turnpike Barracks. The Defendant was driven to the barracks in one of the marked patrol vehicles located at the scene of the traffic stop. Although the Defendant was not "Mirandized" at that time, nor was he under arrest, the Defendant was being detained pending further investigation.

29. After arriving at the barracks, Officer Volk typed up a search warrant, and accompanying affidavit, and contacted an assistant district attorney. Thereafter, the assistant district attorney approved the search warrant, and Officer Volk took the warrant to a district magistrate judge for approval. This entire process took Officer Volk approximately an hour to an hour and a half to complete.

30. Following the approval of the search warrant, a search of the Chevrolet Blazer was conducted. Officer Volk participated minimally in the search. Specifically, Officer Volk retrieved some documents from the vehicle and the two cellular telephones that he had seen during the traffic stop.

31. The station commander, Sergeant Anthony F. DeLuca, also participated in the search of the Blazer. He recovered four kilos of cocaine from a duffle back that was laying on the front passenger seat of the Blazer.

32. The Defendant was present during the entire search of the Blazer. Once the duffle bag was opened, the Defendant stated to the officers present that was required to try to keep them from finding it, and that they had found what they wanted.

33. Officer Volk explained to the Defendant that he was under arrest. Next, Officer Volk proceeded to gather up the

documents, the cocaine packages,[4] the cell phones, and the duffle bag. After transporting these items for storage and/or analysis, Officer Volk prepared a criminal complaint.

34. After Officer Volk completed typing the criminal complaint, the Defendant was transported to Magistrate Judge Douglas Bell in order to set bond and formally inform the Defendant of the charges filed against him. The Defendant was also provided with a copy of the criminal complaint.[5]

35. The entire proceeding before Magistrate Douglas Bell took approximately twenty minutes. During the proceeding, the Defendant stated that he was just a "burro", which is a courier to transport drugs. He also claimed that he did not take drugs, rather he was given the merchandise in order to transport it from Brownsville, Texas to Pennsylvania. Nevertheless, the Defendant accused Officer Volk of racial profiling because he was Latino.

36. At the conclusion of the magistrate judge hearing, the Defendant was transported to the Somerset County Jail.

## CONCLUSIONS OF LAW

### Initial Stop

 1. The decision by a police officer "to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996)(cited in *United States v. Bellinger*, 343 F.Supp.2d 417, 419 (E.D.Pa.2004)). Consequently, "a traffic stop does not depend on the subjective intent of the officer involved." *Bellinger*, 343 F.Supp.2d at

419. In *Whren*, the Supreme Court determined that "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Whren*, 517 U.S. at 813, 116 S.Ct. 1769 (quoted in *Bellinger*, 343 F.Supp.2d at 419). Therefore, "as long as there existed probable cause to believe that a traffic violation occurred, an officer can legally stop a car . . . ." *Bellinger*, 343 F.Supp.2d at 419.

2. In the case *sub judice*, Officer Volk observed a visible traffic violation in that the Chevrolet Blazer operated by the Defendant was tinted in violation of section 4524 of the Pennsylvania Vehicle Code. 75 Pa.C.S.A. § 4524.

 3. Therefore, the Court determines that the initial traffic stop of the Defendant did not violate the Fourth Amendment.

### Investigative Detention

 1. Pursuant to the rule of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), "a police officer may conduct a brief investigatory stop based on a reasonable and articulable suspicion that a particular person has committed, is committing, or is about to commit a crime." *United States v. Griggs*, 114 F.Supp.2d 334, 338 (M.D.Pa.2000). The Supreme Court has determined that a "routine traffic stop is analogous to a 'Terry stop' and therefore also is analyzed under the reasonable suspicion standard." *Griggs*, 114 F.Supp.2d at 338 (*citing Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d

---

**4.** The cocaine seized during the search of the Chevrolet Blazer was ultimately taken to the state police crime laboratory for analysis. It was determined that the Defendant was transporting 4,007 grams of cocaine CL.

**5.** The Court observes that this matter was originally prosecuted as a state criminal matter in the Court of Common Pleas of Somerset County, Pennsylvania.

317 (1984)); *see also United States v. Brignoni–Ponce,* 422 U.S. 873, 881, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).

■ 2. "Whether an articulable and reasonable suspicion exists 'turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him.'" *United States v. Hernandez,* 872 F.Supp. 1288, 1293 (D.Del.1994)(*quoting Maryland v. Macon,* 472 U.S. 463, 470, 105 S.Ct. 2778, 2783, 86 L.Ed.2d 370 (1985)). Courts consider "the totality of the circumstances—the whole picture" when making this determination. *Hernandez,* 872 F.Supp. at 1293 (*quoting United States v. Sokolow,* 490 U.S. 1, 8, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989)).

■■ 3. Consequently, even if a police officer lawfully detains an individual for a traffic violation, an officer "may detain the individual only for that period necessary to investigate the traffic violation." *Hernandez,* 872 F.Supp. at 1293 (citing to *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325–1326, 75 L.Ed.2d 229 (1983)("an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop")). Furthermore, "[d]uring the investigation, an officer may question the stopped individual concerning the traffic violation, but the officer may not, for example, use the stop to question the individual concerning other unrelated potentially criminal activity." *Hernandez,* 872 F.Supp. at 1293 (*citing Berkemer,* 468 U.S. at 439, 104 S.Ct. 3138).

■ 4. However, if "during the questioning related to the routine traffic stop, the officer identifies articulable facts that create reasonable suspicion of additional criminal activity, the officer may continue to detain the driver and investigate the facts giving rise to the additional suspicion." *Hernandez,* 872 F.Supp. at 1293 (*citing Terry,* 392 U.S. at 21, 88 S.Ct. 1868). The officer's investigation includes "a moderate number of questions ... to try to obtain information confirming or dispelling the officer's suspicions." *Hernandez,* 872 F.Supp. at 1293 (*citing Berkemer,* 468 U.S. at 439, 104 S.Ct. 3138).

5. The Court considers whether the "same totality of the circumstances test initially used to determine whether an articulable and reasonable suspicion exists applies once more." *Hernandez,* 872 F.Supp. at 1294.

■ 6. In the case *sub judice,* the Court determines that the use of the canine did not violate the Defendant's Fourth Amendment rights because Officer Volk had reasonable suspicion to detain the Defendant beyond the scope of an ordinary traffic stop in order to investigate whether the Defendant was transporting drugs. Specifically, in light of the facts and circumstances confronting Officer Volk, he observed the following indicators of possible drug activity which in their totality provided the reasonable suspicion to call for the canine:

a) Defendant did not know who Victor Bennet was although the name was included on the insurance document provided to Officer Volk;

b) Defendant resides in Brownsville, Texas, which borders the country of Mexico and is a known hub of drug activity;

c) Defendant was traveling toward Philadelphia, Pennsylvania, also a known hub of drug activity;

d) Although far from his home in Texas, the Defendant knew very specific information regarding street names and locations within the city of Philadelphia;

e) Defendant told Officer Volk that he would be staying in Philadelphia for the night then traveling a significant distance to Columbus, Ohio the next day;

f) Defendant's story to Officer Volk regarding a visit to Philadelphia to visit cousins was called into question by later testimony that the Defendant's "cousins" changed to a visit to the Defendant's "uncle" who, once the Defendant was in Philadelphia, would remove the tint from the Defendant's windows;

g) Defendant had two cellular telephones inside the Chevrolet Blazer which is characteristic of those individuals who are involved in drug trafficking;

h) A strong odor of air freshener emanated from the vehicle which is also characteristic of those individuals who are involved in drug trafficking, and who are attempting to mask the odor of drugs from dogs;

i) Although the Defendant claimed to work as a carpenter, Officer Volk noticed that his hands were smooth and manicured, not characteristically rough like a person who works with his hands;

j) Driver's side window would not roll down, which commonly occurs when drugs are hidden inside the door panel of a vehicle in order to transport the drugs;

k) Defendant lied to Officer Volk about the last occasion when the Chevrolet Blazer crossed the border from the United States into Mexico;

l) Defendant lied to Officer Volk about whether he had ever been in trouble with the law or whether he had ever been fingerprinted;

m) Defendant had been arrested in 2000 for illegal expenditures and investing drug money;

n) Based upon Officer Volk's years of experience in drug interdiction, Officer Volk testified that many of the above-listed indicators are consistent with a drug courier profile; and

o) Upon requesting to search the Chevrolet Blazer, the Defendant responded in an agitated manner that he had consulted a lawyer prior to his travel to Pennsylvania, and the lawyer advised the Defendant not to consent to a search of the vehicle that the Defendant was operating.

■ 7. The Court also determines that the length of the detention was not unreasonable in light of the factual circumstances. *See United States v. Maguire,* 918 F.2d 254, 258 (1st Cir.1990)("each case necessarily turns on its own unique facts").

8. The reason that the Defendant was detained for a significant period of time was due to road work, construction, and traffic that Trooper Johnson encountered on his way to the scene of the traffic stop. Moreover, Trooper Johnson and his dog were the only available canine unit on the date of the traffic stop.

9. Therefore, based upon the facts and the extenuating circumstances surrounding Trooper Johnson's ability to get to the scene of the traffic stop, the Court determines that it was not unreasonable for Officer Volk to detain the Defendant during that period in order to conduct further investigation based upon his reasonable suspicion that criminal activity was afoot.

***Search Warrant***

1. Although briefly addressed by the Defendant and the United States, the Court determines that Officer Volk did not misrepresent information provided in the application for the search warrant to the magistrate judge. Specifically, the documentation provided by the Defendant to Officer Volk during the traffic stop did not include valid, current insurance information. Rather, what was provided was ambiguous documentation of a receipt from State Farm Insurance. Indeed, one of the documents provided to Officer Volk included the name Victor Bennet, which the Defendant could not explain.

2. Additionally, at the time Officer Volk prepared the application for the

search warrant, he was unaware that the name provided on the Defendant's registration, Maria Leal, was indeed the Defendant's spouse. Officer Volk testified that he simply knew the car was registered in a third-party name.

3. Accordingly, the Court determines that Officer Volk did not misrepresent information on the application for the search warrant on February 2, 2004.

## DISCUSSION

In the case *sub judice*, the Defendant requests that the Court find Officer Volk's testimony incredulous. The Defendant also argues that Officer Volk did not have articulable facts amounting to reasonable suspicion which formed a basis upon which to detain the Defendant beyond an ordinary traffic stop. Furthermore, the Defendant asserts that this case is analogous to that presented in *Karnes v. Skrutski*, 62 F.3d 485 (3d Cir.1995) in that the Defendant's refusal to give consent to search cannot provide a reasonable suspicion to detain the Defendant.

The Court determines, however, that Officer Volk's testimony is credible and that those indicators testified to by Officer Volk which provided him with reasonable suspicion to detain the Defendant to conduct further investigation have remained consistent throughout his testimony. The Court also determines that while the "use of indicators or drug courier profiles ha[v]e been sharply challenged", the factual circumstances in their totality which are present in the case *sub judice* create reasonable suspicion of additional criminal activity, specifically drug trafficking. *Karnes*, 62 F.3d at 489.

Finally, the Court observes that Officer Volk testified that the Defendant's refusal to consent to the search of the Blazer did not provide a basis to further detain the Defendant. Rather, it was the Defendant's insistence that he had consulted a lawyer about whether he should consent to

a search of the Chevrolet Blazer while driving to Philadelphia, Pennsylvania. Finding it unusual that the Defendant would seek advice of a lawyer for consent searches, Officer Volk merely added this indicator to the list of other factors indicative of illegal drug activity.

Accordingly, the Defendant's Motion to Suppress Evidence is denied, and an appropriate order follows.

### ORDER

**AND NOW**, this 29th day of August, 2005, in accordance with the foregoing Memorandum Opinion and Order, and based upon consideration of the Defendant's Motion for Discovery and to Suppress Evidence (Document No. 19), the Response by the United States of America (Document No. 22), and a hearing on Defendant's motion (Document Nos. 31 & 32), **IT IS HEREBY ORDERED** that the Defendant's Motion to Suppress Evidence is denied.

**IT IS FURTHER ORDERED** that the Defendant shall file an amended motion for discovery, within twenty days, based upon those documents that remain in dispute following the above-mentioned hearing.